642 A.2d 792 (1993)
In re SEA-LAND CORPORATION SHAREHOLDERS LITIGATION.
George GROVER, Arthur W. Austin, Bernard and Rosalyn Lowe, Trustees U/D/T dated June 21, 1961, for the benefit of Rosalyn Lowe, Hecco Ventures and James J. Cotter, Plaintiffs,
v.
Harold C. SIMMONS, Joseph F. Abely, Jr., Dwight L. Allison, Jr., Robert W. Dixon, Jr., The Amalgamated Sugar Company, LLC Corporation, CSX Corporation, CSA Acquisition Corporation, and Sea-Land Corporation, Defendants.
Civ.A. No. 8453.
Court of Chancery of Delaware, New Castle County.
Date Submitted: October 14, 1992.
Date Decided: March 19, 1993.
Date Revised: March 26, 1993.
*793 Robert K. Payson and Arthur L. Dent, of Potter Anderson & Corroon, Wilmington, Joseph A. Rosenthal, of Rosenthal, Monhait & Gross, Gary J. Greenberg, New York City, for plaintiffs.
Steven J. Rothschild and Karen L. Valihura, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendants Sea-Land Corp., Joseph F. Abely, Jr., Dwight L. Allison, Jr., Robert W. Dixon, Allan R. Dragone, John H. Muller, Jr. and Chester W. Nimitz, Jr.
Kevin G. Abrams and Lisa A. Paolini, of Richards, Layton & Finger, Wilmington, Robert B. Mazur, of Wachtell, Lipton, Rosen & Katz; for defendants CSX Corp. and CSA Acquisition Corp.

*794 OPINION

JACOBS, Vice Chancellor.
Presently sub judice are the defendants' motions for summary judgment in this consolidated class action brought by former shareholders of Sea-Land Corporation ("Sea-Land").

I. PROCEDURAL HISTORY

The plaintiffs in this action challenge the terms by which Sea-Land was acquired in 1986 by CSX Corporation ("CSX") through a subsidiary (collectively, the "CSX defendants"). As structured, the acquisition itself was unremarkable. On April 21, 1986, CSX proposed to acquire Sea-Land at $28 per share (the "CSX Offer"). On April 25, 1986, the two companies signed a merger agreement. Four days later, CSX formally commenced a $28 per share cash tender offer for all outstanding Sea-Land shares. The tender offer was consummated on May 28, 1986, and on September 25, 1986, a CSX subsidiary was merged into Sea-Land at the same price per share.
What is controversial is that on April 23, 1986, two days after CSX announced its intent to make an offer, CSX contracted to purchase the 39.5% stock interest in Sea Land owned by affiliates of Harold Simmons ("Simmons").[1] In that transaction, CSX paid the Simmons Group approximately $50 million (over $5 per share) for an option (the "Simmons Option") to purchase the 39.5% block at $28 per share. The plaintiffs claim that the Simmons Option was a device which enabled CSX improperly to funnel to the Simmons Group disproportionately greater consideration than was received by Sea-Land's remaining shareholders.
In their complaint the plaintiffs allege that the Sea-Land directors breached their fiduciary duty to the remaining shareholders by approving CSX's $28 per share Offer without having first extracted from CSX the same $33 per share CSX paid to the Simmons Group. Named as defendants are Sea-Land and six of its eight directors: Joseph F. Abely, Jr., Robert W. Dixon, Dwight L. Allison, Jr., John H. Muller, Jr., Chester W. Nimitz, Jr. and Allan R. Dragone (collectively, the "Sea-Land defendants"). Also joined as defendants and charged with independent breaches of fiduciary duty are the Simmons Group and the CSX defendants, who also stand accused of aiding and abetting the breaches of duty by Sea-Land's defendant directors. The defendants deny these allegations.
This Opinion marks the fourth time that the Court has visited this controversy. The initial complaint was filed on April 17, 1986, four days before CSX announced its proposed offer. On May 16, 1986, certain plaintiffs moved for a temporary restraining order to halt the closing of the CSX tender offer. That application was denied. Hecco Ventures v. Sea-Land Corp., Del.Ch., C.A. No. 8486, Jacobs, V.C., 1986 WL 5840 (May 19, 1986). On August 4, 1986, the plaintiffs filed a consolidated supplemental complaint, which LLC moved to dismiss. On May 23, 1987, the Court granted LLC's dismissal motion with leave to amend. In re Sea-Land Shareholders Litig., Del.Ch., Cons. C.A. No. 8453, Jacobs, V.C., 1987 WL 11283 (May 22, 1987). On June 22, 1987, the plaintiffs filed an amended consolidated supplemental complaint, which the Simmons Group moved to dismiss as to them. The plaintiffs voluntarily dismissed Simmons and Amalgamated without prejudice, and on May 13, 1988, the Court granted the dismissal motion with respect to LLC. In re Sea-Land Corp. Shareholders Litig., Del.Ch., Cons. C.A. No. 8453, Jacobs, V.C., 1988 WL 49126 (May 13, 1988).
After extensive discovery, the CSX defendants and the Sea-Land defendants both moved for summary judgment. This is the Opinion of the Court on the defendants' summary judgment motions, which were orally argued on October 14, 1992.

*795 II. PERTINENT FACTS[2]
Sea-Land is a Delaware corporation engaged in transporting containerized cargo on ocean trade routes and throughout the northern hemisphere. Before the September, 1986 merger, Sea-Land had eight directors, all of whom were independent except for Joseph F. Abely, Jr. ("Abely"), Sea-Land's Chairman and Chief Executive Officer. Sea-Land's common stock was traded on the New York and Pacific Stock Exchanges.
During the spring of 1985, Simmons began purchasing Sea-Land stock. On November 18, 1985, Simmons wrote to Sea-Land's board of directors, offering to acquire all of Sea-Land's outstanding common stock for $25 per share. In response, Abely retained Dillon, Read & Co., Inc. ("Dillon Read") to advise the board concerning Simmons' proposal. Dillon Read advised the board that Simmons' highly conditional proposal was not adequate from a financial point of view. Accordingly, at a meeting held on November 25, 1985, the Sea-Land board rejected the proposal. The board also considered various defensive measures, including adopting a shareholder rights plan ("poison pill"), and instructed Abely "to explore all available alternatives to maximize value to the share-owners," including negotiating a transaction with Simmons. (Ex. 21, S006336.)
Carrying out the board's mandate, Dillon Read canvassed the acquisition market over the next three weeks, and contacted twenty-three potential acquirors. Nine of these received confidential information about Sea-Land after signing confidentiality agreements. Those agreements barred the use of that information to purchase Sea-Land stock without the Sea-Land board's consent. By mid-December 1985, only two companies remained interested in acquiring Sea-Land. CSX was one of them; however, in early January 1986, CSX told Sea-Land that it was no longer interested in an acquisition.
On December 3, 1985, Abely and Simmons met, together with their legal representatives. At that meeting Simmons requested the same confidential information the nine other potential acquirors had received. Because Simmons would not sign a confidentiality agreement, his request was refused.
The next day, December 4, 1985, Simmons made another proposal, also for $25 per share, to acquire Sea-Land. Simmons offered not to buy or sell Sea-Land shares without board approval if he were given the opportunity to top any bona fide higher bid. The Sea-Land board rejected that proposal on December 9, and the next day the board adopted a shareholder rights plan with a 40% trigger.[3]
On December 17, 1985, Simmons publicly disclosed his ownership of 34.8% of Sea-Land stock and his intent to acquire up to 39.9%. On December 30, 1985, Simmons informed Sea-Land that in anticipation of Sea-Land's May 1986 annual meeting, he would nominate three persons to board positions and solicit proxies on their behalf. A special Sea-Land board meeting was held on January 6, 1986, at which the board instructed Abely to invite Simmons to make a firm and adequate offer. Abely thereupon sent Simmons a letter inviting him "to come forward." (Ex. 29, 3.) The following day, Simmons publicly disclosed that he had increased his holdings of Sea-Land common stock to 39.5%.
On January 8, 1986, representatives of Sea-Land and Simmons met. Simmons was invited to make a good-faith acquisition proposal, and was reminded of the board's position that his earlier $25 proposal was not adequate. Sea-Land's legal advisors met again with Simmons' representatives on January 15, 1986. After some discussion, Simmons' *796 representatives were told that if Simmons made a formal $26 per share cash offer, management would be willing to recommend that the Sea-Land board approve it, subject to a fairness opinion from Dillon Read. Further negotiations took place on January 18 and 19, but they ran aground and were terminated.
At a special meeting held on January 21, 1986, the Sea-Land board decided not to redeem the shareholder rights that had previously been distributed (but had not yet become exercisable) after Simmons acquired over 35% of Sea-Land's stock. See supra note 3. As part of an accommodation designed to avoid a proxy contest, the board also agreed to support Simmons' slate of nominees and to allow Simmons to attend future board meetings. To create the necessary vacancies for the Simmons' nominees, it was agreed that two Sea-Land directors, J. Paul Sticht and James J. Kerley, would not stand for reelection.
If any harmony resulted from that arrangement, it lasted only six weeks. On March 6, 1986, Simmons sent Abely a letter demanding that Abely resign. Thereafter, Simmons wrote to the Sea-Land board members, explaining his position. When Simmons later solicited Abely's response, Abely told Simmons that the board would decide whether or not he should remain in office.
Then, in mid-March, CSX reappeared on the scene. Peter Peterson, Chairman of the Blackstone Group, which was CSX's financial advisor, arranged a meeting in New York City between Abely and Hays Watkins, CSX Chairman and Chief Executive Officer ("Watkins"). At that meeting the participants discussed a possible business combination between CSX and Sea-Land, and the two companies then established working groups to study the potential benefits of such a combination.
On April 8, 1986, Abely met with Simmons, who said that he would make an offer to acquire Sea-Land for $26 per share. Abely suggested that lawyers for Sea-Land meet with Simmons' lawyers to draft a proposal specific enough for presentation to the Sea-Land board. The next day, John H. Mullin, III, of Dillon Read ("Mullin"), advised CSX's representatives that Simmons would soon be making a cash offer at $26 per share. On April 11, 1986, Simmons publicly announced a verbal offer to purchase, for $26 per share, all the Sea-Land shares he did not already own. The Simmons proposal was made subject to certain conditions, including the obtaining of financing. Attorneys for Simmons and Sea-Land arranged to meet on April 16 to discuss that proposal; however, after Sea-Land learned that CSX was considering making a higher offer, it canceled that meeting.
On April 16, 1992, representatives of CSX met with Abely and their Sea-Land counterparts in New York. The CSX representatives advised that CSX was interested in acquiring Sea-Land. Abely then left the meeting, after having instructed the Sea-Land representatives to negotiate the terms and conditions of a CSX offer.
Later that evening or early the next morning, Mullin told Abely that CSX would be offering $28 per share. Mullin's information came from Stephen Schwarzman, President of the Blackstone Group ("Schwarzman"), who told Mullin that (i) CSX had authorized him to offer no more than $28 per share, and that (ii) any CSX offer would be conditioned upon Sea-Land granting CSX an option to purchase 6.5 million newly issued Sea-Land shares at $28 per share (the "Sea-Land Option"). The Sea-Land Option concept was acceptable to Abely, who testified that it would "have a very disciplining effect on Mr. Simmons as he considered his position in the wake of it." (Abely II Dep., 126.)[4] After being told of CSX's proposal, Abely instructed his representatives to negotiate a formal agreement with CSX.
The CSX board met on Friday, April 18, 1986, and approved management's proposal to acquire Sea-Land at a price not to exceed $32 per share.[5] The acquisition was conditioned *797 upon CSX obtaining the Sea-Land Option. After the CSX board meeting, Schwarzman telephoned Robert J. Fahey, a Sea-Land Senior Vice President ("Fahey"). Mr. Fahey's notes of that conversation reflect that Schwarzman had attempted to call Abely[6] to advise that (i) the CSX board had authorized a merger, (ii) CSX was willing to make a deal on an advantageous basis, (iii) Schwarzman would call Abely the following day to discuss a meeting with Simmons, as well as Abely's "script" for that meeting, and that (iv) Abely might want to announce the CSX Offer publicly, since it would be "more difficult for Simmons to split 2 boards." (Ex. 124.)
Later that same day, and at the request of CSX's advisers, Abely called Simmons to arrange a meeting among CSX, Simmons, and himself. The meeting was scheduled for Monday, April 21, at Simmons' office in Dallas. CSX's representatives wanted Abely to introduce them to Simmons, after which they would try to persuade Simmons to tender his shares into the CSX Offer. Another purpose of the meeting, according to Sea-Land director John H. Muller, Jr. ("Muller"), was to afford Simmons an opportunity to make a final, best offer for Sea-Land.
On April 21, Abely flew to Dallas with one of his attorneys, Blaine V. Fogg, Esquire ("Fogg") of Skadden, Arps, Slate, Meagher & Flom. Before going to Simmons' office, Abely and Fogg first met briefly with three CSX officers and their advisors. Once at Simmons' office, Abely introduced the CSX group to Simmons and his advisors. Abely then told Simmons that CSX was willing to pay $28 per share, which Sea-Land considered a good price. Thereafter, Abely and Fogg excused themselves and the CSX group met with Simmons privately.
Schwarzman told Simmons that CSX wished to buy his 39.5% block of Sea Land stock at $28 per share. If Simmons did not sell, CSX would freeze him out in a second-step merger in which Simmons would receive a "zero-coupon or a [payment-in-kind] preferred stock on which he would have no cash income for many years, but would ... [incur]... a tax liability ... on an annual basis." (Schwarzman Dep., 104.) Simmons replied that he was not interested in selling his stock or in negotiating further with CSX. He told the CSX group to leave his office, and as the CSX group left, Simmons admonished that even CSX was not invulnerable to a takeover.
Abely and Fogg returned to Simmons' office after the CSX representatives had departed. Concerning the ensuing discussion, Abely testified that he told Simmons that Sea-Land would entertain an offer from Simmons above $28 per share. Although Simmons did not specifically recall Abely saying that, he did understand Abely's remarks to carry that implication. Simmons also testified that he knew he could make a higher bid if he so desired.
Abely then gave Simmons the standard Sea-Land "book" containing confidential information about Sea-Land. Simmons did not request any further confidential information, because he believed that he possessed sufficient information to decide whether or not to raise his bid.
Meanwhile, the CSX group went from Simmons' office to the airport. There they briefed Watkins by telephone on their meeting with Simmons, and discussed whether CSX should raise its bid for all Sea-Land shares or for Simmons' shares alone. It was decided that CSX would go forward with the $28 per share offer.[7]
Later that same day, CSX publicly announced its proposal to acquire Sea-Land for $28 per share. The offer would remain open until Friday, April 25, and it would be conditioned on CSX obtaining the Sea-Land Option. Shortly after the CSX Offer was announced, Sea-Land issued a press release describing the CSX Offer as "most welcome," and disclosing that Sea-Land management would recommend its approval by the Sea-Land board. (Ex. 81.) A special Sea-Land board meeting to consider the CSX proposal was scheduled for Friday, April 25.
*798 That same afternoon (April 21), Simmons called Watkins to convey his displeasure over the ultimatum that the CSX group had given him earlier that morning. Simmons told Watkins that he was a long-term investor in Sea-Land and wished to remain one, and that he was willing to be a partner of CSX, but "if you try to push me out [at no profit], we are going to have a fight." (Ex. 119.) Watkins told Simmons that he would consult with his advisors about Simmons' position.
Watkins called Simmons back the next morning, April 22, and the two discussed a possible sale of Simmons' 39.5% block of Sea-Land shares to CSX. In either that or a later conversation with Watkins, Simmons proposed that for $7 per share he would grant CSX an option to purchase his 39.5% block of stock at $28 per share. Watkins later counteroffered $5 per share for that option. Later, Simmons called Watkins back to advise him that he would accept $5 per share if CSX would also reimburse Simmons $4 million for his legal and banking expenses. Watkins agreed.
CSX's agreement with Simmons was finalized on those terms, and it was executed early in the morning of April 23, 1986. The CSX-Simmons agreement provided that in exchange for $5 per share plus $4 million, Simmons granted CSX an option, exercisable between July 15 and August 31, 1986, to purchase the Simmons Group's Sea-Land stock. While the Simmons Option was in effect, Simmons would not purchase Sea-Land or CSX stock; moreover, he would not buy stock in either CSX or Sea-Land for ten years. After the agreement was finalized, Simmons wrote a letter to the Sea-Land board, advising that he would attend no Sea-Land board meetings while the Simmons Option was in effect.
Abely did not learn of the Simmons Option until after its terms had been agreed to. Watkins testified that he called Abely at Sea Island, Georgia after he had verbally agreed to its final terms. Abely testified that he first learned of the Simmons Option from John H. Muller, Jr., another Sea-Land director. Muller testified that after he told Abely about the Simmons Option, Abely became irate and "ranted and raved" about it for five minutes. (Muller Dep., 152.)
Abely and other Sea-Land representatives then telephoned Watkins, and tried to persuade him to increase CSX's offer for the remaining Sea-Land shares. Watkins responded that CSX's arrangement with Simmons was independent of the $28 price CSX was offering for the remaining Sea-Land shares, which would remain unchanged. Abely told Watkins that Sea-Land's board would be informed of CSX's arrangement with Simmons and of CSX's refusal to increase the price being offered to the remaining shareholders, and that the board would decide for itself whether to accept CSX's offer. Later that day, Abely and Mullin each called Schwarzman to convey their displeasure over the CSX/Simmons option arrangement. Both times Schwarzman responded that CSX's Offer would not be increased, and that it would be withdrawn if Sea-Land did not accept it on or before that Friday, April 25th. On the morning of April 25, Mullin spoke to Schwarzman once again, but with no different result. Ultimately, Abely decided, and advised Schwarzman, that he would recommend the CSX Offer to the Sea-Land board.
During his conversation with Watkins, Abely insisted that CSX indemnify the Sea-Land board against possible shareholder litigation arising from the different treatment of Simmons and of Sea-Land's other shareholders. Abely's concern was that if Sea-Land was merged out of existence, Sea-Land's directors would no longer have continuing indemnification protection for claims arising out of the merger.[8] Watkins acceded to Abely's request, and the merger agreement included a provision that CSX would indemnify Sea-Land's officers and directors against all litigation expenses related to the merger to the fullest extent permitted by Delaware law.
The Sea-Land board held a special meeting to consider the CSX Offer on April 25, *799 1986. Abely reported on the events leading up to that offer, including the Simmons Option. Fogg next reviewed a draft of the proposed merger agreement between CSX and Sea-Land, and Sea-Land's other legal and financial advisors discussed various aspects of the proposed transaction. Mullin then presented Dillon Read's financial analysis, supportive of his firm's opinion that the CSX Offer was fair from a financial point of view. After Abely advised the board that management recommended the CSX Offer, the board voted to approve the merger agreement.

III. CONTENTIONS AND APPLICABLE LEGAL STANDARD

The basic thrust of the amended complaint is that the Sea-Land defendants violated their fiduciary duties to the shareholder class by actively participating in, or accepting and ratifying, a transaction that called for disparate treatment of similarly situated shareholders. The plaintiffs claim that such disparate treatment constituted a breach of a fiduciary duty, which plaintiffs describe as the "rule of equality."
The plaintiffs also contend that the Sea-Land defendants violated their duties of loyalty and care by favoring CSX and accepting its offer without adequately considering alternative strategies, in particular, rejecting the CSX Offer to induce CSX to raise its bid. The CSX defendants are also charged with having committed similar "rule of equality" violations and having aided and abetted the Sea-Land defendants' breaches of fiduciary duty.
Both the Sea-Land and the CSX defendants seek the grant of summary judgment in their favor. The Sea-Land defendants argue that the board's decision to accept CSX's Offer was protected by the business judgment rule, and that as a matter of law the plaintiffs' "rule of equality" is inapplicable. The CSX defendants argue that Delaware law permits non-fiduciary third parties to act in their self-interest, the undisputed facts do not support plaintiffs' aiding and abetting claim, and that the plaintiffs have not established the necessary element of injury.[9]
A motion for summary judgment will be granted only where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Ch.Ct.R. 56(c). Any doubts regarding the existence of an issue of material fact will be resolved, and all reasonable factual inferences will be drawn, against the moving party. Nash v. Connell, Del.Ch., 99 A.2d 242, 243 (1953). However, those inferences must be supported by evidence (as opposed to mere assertions or allegations) that supports each element of the claim. In re Tri-Star Pictures, Inc. Litig., Del.Ch., Cons. C.A. No. 9477, Jacobs, V.C., Op. at 9-10, 1992 WL 37304 (Feb. 21, 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).
In Part IV of this Opinion the Court addresses the plaintiffs' "rule of equality" claim, including their contention that CSX and Sea-Land conspired to pay Simmons a premium at the expense of Sea-Land's other shareholders. In Parts V and VI, respectively, the Court considers the claims that the Sea-Land defendants breached their fiduciary duties of loyalty and care by approving the CSX Offer.

IV. THE "RULE OF EQUALITY" CLAIMS

The plaintiffs premise their first set of claims upon a fiduciary duty which they have termed the "rule of equality." (Pls.'Br.75.) That slogan invokes the uncontroversial proposition that all shares of the same type, series, or class are, by definition, equal. From that premise the plaintiffs conclude that "it is per se illegal to discriminate among similarly situated shareholders in connection with a transaction involving the sale of the corporate enterprise in which all shares are to be acquired by a purchaser." (Pls.'Br.,75-76.)[10]
*800 That conclusion obfuscates two quite distinct arguments, each resting upon a different view of the facts. The first is that Abely conspired with CSX to allocate a disproportionate share of the merger consideration (in the form of an option) to Simmons to effect CXS's acquisition of Sea-Land. The second is that even if there was no conspiracy or involvement by Sea-Land in negotiating the Simmons Option, the Sea-Land board must be deemed to have blessed the disproportionately greater payment to the Simmons Group for its stock than was made to Sea-Land's other shareholders. I conclude that under either scenario the plaintiffs' claim cannot survive summary judgment. The first scenario is unsupported factually; the second is supported factually, but the board's action was clearly proper under Delaware law.

A.
As support for their first contention the plaintiffs rely heavily upon Beaumont v. American Can Co., N.Y.Sup.Ct., Index No. 28742/87, Cahn, J. (May 8, 1991). But the plaintiffs' reliance upon Beaumont, and the scenario upon which that case rests, presupposes a view of the facts that is without support in the record. The contrast between Beaumont and this case drives that point home.
In Beaumont, American Can Co. ("American Can"), and Associated Madison Companies, Inc. ("Associated Madison") signed a memorandum of intent outlining the terms of a proposed merger of Associated Madison into American Can. The memorandum, as amended, provided that the holders of up to 49% of Associated Madison's common stock would receive $15 per share, and that each of the remaining Associated Madison shares would be exchanged for a specified percentage of American Can shares. The memorandum also permitted American Can to purchase Associated Madison shares directly from shareholders before the merger was consummated. That is what American Can did: before the merger American Can purchased from five institutional investors approximately 34% of Associated Madison's outstanding shares for $15 per share. Later, on the merger date, most of the remaining Associated Madison stockholders received, for each of their shares, stock of American Can valued at $12.61. (Only 9% of American Can's individual shareholders received $15 per share in cash.) The Beaumont court ruled that the plaintiffs (i.e., the shareholders who received American Can stock valued at $12.61 per share) were entitled to receive $15 worth of American Can stock for each of their Associated Madison shares.[11]
Thus, in Beaumont, the parties (including the board of the acquired company) expressly agreed at the outset to treat Associated Madison's shareholders disparately. Some shareholders would first be offered *801 cash; others would later receive American Can stock of possibly lesser value. American Can's pre-merger purchases of stock from the institutions were found to be "thoroughly linked with and made a part of the merger," Beaumont, supra, at 4, because the parties had agreed that the total cash consideration American Can would pay in the merger would include the cash it expended to purchase Associated Madison shares before the merger. Here, in contrast, the Sea-Land board never agreed that the Simmons Option would be part of the merger transaction, nor did the board ever agree to allocate the transaction consideration on terms more favorable to the Simmons Group than to the remaining Sea-Land shareholders.
In their brief the plaintiffs strive, assiduously but unsuccessfully, to portray this case as a Beaumont clone. They insist that Abely (and perhaps other Sea-Land directors) conspired with CSX's Watkins to formulate the Simmons Option, thus enabling Sea-Land to be acquired by the "white knight" CSX rather than the "hostile raider" Simmons. Under that scenario the Simmons Option (like the purchase of the institutions' stock in Beaumont) becomes an integral part of a single, integrated transaction to acquire Sea-Land.
The primary record support cited for this conspiracy scenario are two evidentiary exhibits: Fahey's notes regarding Abely's "script" for his meeting with Simmons (Ex. 124) and Abely's undated notes referring to the Simmons Option and the CSX Offer (Ex. 80).[12] That evidence (plaintiffs argue) creates the inference that CSX and Sea-Land were pursuing a joint strategy that included allocating to Simmons a disproportionate amount of the overall transaction consideration.
The flaw in this argument is that Exhibit 80 does not evidence any involvement by Abely in the Simmons' Option, and the balance of the record affirmatively disproves that hypothesis.[13] Both Watkins and Simmons testified, without contradiction by anyone, that neither Abely nor anyone else from Sea-Land participated in the negotiation of the Simmons Option.[14] In fact, Abely was surprised and annoyed when he was told that the Simmons Option had been negotiated and concluded.
Simmons, the beneficiary of this alleged conspiracy, testified that one of his employees initially suggested the option concept, and that Watkins and he negotiated the option's terms by telephone. Near the end of those negotiations Simmons made his $4 million expense reimbursement proposal. Watkins' consent to that proposal in the same telephone conversation established the total price of the Simmons Option. That Abely made a note of the $4 million reimbursement does not tend to prove his involvement in formulating or negotiating the Simmons Option. If his notation supports any inference, it is that Abely took these notes between the time the Simmons Option was finalized and the time the Sea-Land board approved the CSX Offer. Therefore, Abely's notes do not create a material fact dispute or triable fact issue supporting the charge that Sea-Land and CSX conspired to pay a premium to Simmons as part of a unitary transaction.

B.
The plaintiffs next contend, in the alternative, that even if the Sea-Land defendants *802 did not participate in formulating, negotiating, or consenting in advance to the Simmons Option, the Sea-Land board still acted improperly by approving the CSX Offer. Because the CSX Offer antedated the Simmons Option (so the argument goes), the board's approval of the CSX Offer should be treated as an approval of the Simmons Option, and, in particular, its disproportionately higher payments.
Under Delaware law, a purchaser may acquire a block of stock from one shareholder at a premium, and thereafter may offer a lower price for the corporation's remaining shares. See, e.g., Citron v. Steego Corp., Del.Ch., C.A. No. 7861, Allen, C., Slip. Op. at 16-20, 1988 WL 94738 (1988) (acknowledging a purchaser's right to buy shares held by a fiduciary and then offer a lower price for all remaining shares); see also Doleman v. Meiji Mutual Life Ins., 9th Cir., 727 F.2d 1480, 1482 (1984) ("[The claim] baldly asserts that a purchaser of control has a duty to purchase all the stock at the same price. Such an `all or nothing' principle has been embraced by no case or commentary of which we are aware."). The plaintiffs concede that in such a case the directors of the target company would breach no fiduciary duty by approving the subsequent offer. (Oral Argument Tr., 90.)
Nonetheless, the plaintiffs argue that liability must be visited upon Sea-Land's directors in this particular case, because CSX had first announced its intent to offer to purchase all Sea-Land shares before it agreed to the Simmons Option. Plaintiffs contend that once having learned that CSX had agreed to pay Simmons over $33 per share, Sea-Land's directors were not free to approve CSX's offer to pay $28 to the remaining shareholders. I cannot agree that the timing of a third-party stock purchase transaction negotiated between an acquiror and a stockholder, without any involvement of the corporation or its board, disables the board from approving the acquiror's offer for the corporation's shares.[15] That ipse dixit assertion has no basis in legal precedent or sound policy.
The only authority the plaintiffs cite for this position are certain federal securities law provisions (and decisions applying them) which, plaintiffs say, are analogous. In particular they rely on § 14(d)(7) of the Securities Exchange Act of 1934, known as the "best price" rule. Section 14(d)(7) provides that if any person increases the consideration offered in a tender offer, "such person shall pay the increased consideration to each security holder whose securities are taken up...." 15 U.S.C.A. § 78n(d)(7) (1981). Plaintiffs also rely upon Securities and Exchange Commission Rule 10b-13(a), which provides that a person who makes a tender offer for a security may not purchase any such security "otherwise than pursuant to such tender offer ... until the expiration of the [tender offer] period...." 17 C.F.R. 240.10b-13(a).
It is important to note that the plaintiffs never brought any action asserting claims based on these or other federal securities law provisions in connection with this transaction. Presumably that was because those provisions were not applicable. For those federal provisions to be applicable (as distinguished from "analogous"), the April 21, 1986 press release in which CSX announced its $28 Offer would have to be deemed a "tender offer." Plaintiffs do not contend that it was. Yet, they would have this Court achieve that result for them by announcing a state-law fiduciary rule that would both incorporate and then expand these federal provisions to make them cover this case.
The plaintiffs' make no reasoned effort to justify that expedient position from either a legal or a practical standpoint. Had their proposed rule been the law, it would have impeded, if not entirely precluded, the Sea-Land directors from discharging their fiduciary *803 duty to maximize the company's value for the stockholders' benefit, Revlon, 506 A.2d at 182, because the board would have been required to reject the highest and only offer it had received for the company.
The plaintiffs' rule, if adopted and then applied in these circumstances, would also make no practical sense. When the Sea-Land board met to consider the CSX Offer, the Simmons Option (which CSX and Simmons had negotiated and concluded without the involvement of any Sea-Land director) was already a fait accompli. The Sea-Land board could not undo the Simmons Option, nor could it force CSX to offer $33 to the remaining shareholders. Unlike Beaumont, no one at Sea-Land sanctioned any disparate treatment; the disparity had already occurred and it could not be undone. The CSX Offer itself treated all shareholders equally. To be chargeable with having violated a fiduciary duty involving equal treatment precepts, the board must at the very least have approved the transaction creating the disparity. Cf. Beaumont, supra. But cf. Priddy v. Edelman, E.D.Mich., 679 F.Supp. 1425 (1988), aff'd, 6th Cir., 883 F.2d 438 (1989).[16] That the Sea-Land board did not do.
Because the Sea-Land directors violated no fiduciary duty based on what plaintiffs have termed the "rule of equality," it follows that neither did the CSX defendants. See Ivanhoe Partners v. Newmont Mining Corp., Del.Supr., 535 A.2d 1334, 1344 (1987). Therefore, the CSX defendants could not have aided or abetted any breach of duty by the Sea-Land defendants. Accordingly, the defendants are entitled to summary judgment on the plaintiffs' "rule of equality" claims.

V. THE DUTY OF LOYALTY CLAIMS

The plaintiffs next contend that when dealing with Simmons and CSX and in approving the CSX Offer, the Sea-Land directors breached their duty of loyalty in four different respects.
First, the plaintiffs essentially restate their "rule of equality" claim, arguing that since the CSX Offer was per se illegal, its approval was per se unreasonable. As I have previously rejected the premise of that claim (see supra Section IV), the claim itself must be rejected as well.
Second, the plaintiffs contend that the Sea-Land board's approval of the CSX Offer was improperly motivated by the indemnity that CSX furnished as part of the transaction.
Third, the plaintiffs' claim that Abely and the Sea-Land board improperly favored CSX over Simmons. They argue that the Sea-Land board had the duty to sell Sea-Land at the best available price, see Revlon, 506 A.2d at 182, and that the board's (and Abely's) partiality towards CSX was not reasonably calculated to achieve that goal, see Mills Acquisition Co. v. Macmillan, Inc., Del. Supr., 559 A.2d 1261, 1288 (1988).
Fourth, the plaintiffs argue that the board's decision to approve the CSX Offer was unreasonable, because had the board rejected or threatened to reject the CSX Offer, CSX would have made a higher offer.
Before addressing these contentions, I must first resolve the threshold question of whether the duty of loyalty claims are to be decided under the business judgment standard of review or the enhanced scrutiny standard of Unocal Corp., v. Mesa Petroleum Co., Del.Supr., 493 A.2d 946 (1985) ("Unocal"). Under Unocal, as later interpreted in Macmillan, *804 before a board may receive the normal protections of the business judgment rule, it must demonstrate that its actions were reasonable in relation to the advantage sought to be achieved or to the threat allegedly posed. Macmillan, 559 A.2d at 1288; Unocal, 493 A.2d at 955.
The plaintiffs contend that that Unocal standard applies. The defendants urge that the business judgment standard of review applies, because the board's decision to approve the CSX Offer was not a defensive measure. I cannot agree.
The Unocal review standard applies whenever a board adopts "any defensive measure taken in response to some threat to corporate control and policy and effectiveness which touches upon issues of control." Gilbert v. El Paso Company, Del.Supr., 575 A.2d 1131, 1144 (1990); see Yanow v. Scientific Leasing, Inc., Del.Ch., C.A. Nos. 9536 & 9561, Jacobs, V.C., Mem. Op. at 17, 1991 WL 165304 (July 31, 1991) ("Yanow II"). Here the Sea-Land board adopted a "poison pill" and hired an investment banking firm to conduct an intensive search for a "white knight" within days of Simmons' first acquisition proposal. Those actions clearly were taken defensively in response to Simmons' proposal, as were Sea-Land's later negotiations with CSX.
The defendants argue that the Sea-Land board's approval of CSX's Offer was not defensive in nature, but the minutes of Sea-Land's April 25, 1986 board meeting indicate otherwise. They recite that the board decided to approve CSX's offer because of, among other reasons, "[t]he risk to the Corporation... that if the CSX offer were not accepted, CSX would withdraw and the Simmons Interests would ultimately achieve control of the Corporation without providing fair value to the remaining shareowners." (Ex. 45A, SE010.) Further evidence of the defensive nature of the Sea-Land board's action was the board's grant of the Sea-Land Option to CSX, even though CSX already had the executed Simmons Option agreement in hand. The Sea-Land Option was intended to protect CSX's offer for Sea-Land if Simmons did not honor his obligations pursuant to the Simmons Option. For these reasons, the challenged decisions of the Sea-Land board, in particular, its approval of the CSX Offer, will be evaluated under the Unocal standard of review as interpreted in Macmillan.

A.
The plaintiffs argue that when Abely learned of the Simmons Option, rather than demand that CSX treat all shareholders equally, he insisted (improperly) that CSX indemnify the Sea-Land board from liability. The defendants respond that the indemnity was customary in transactions of this kind, did not provide significantly more protection than the Sea-Land directors already had, and, as a matter of law, could not have induced Sea-Land's acquiescence.
It is undisputed that Abely requested that CSX indemnify the Sea-Land board against claims arising out of the merger. There is no evidence that in the process he sacrificed the integrity of the Sea-Land shareholders by not receiving the best available price for their shares. Nor does the nature of the CSX indemnity create any inference to the contrary.
Normally, the receipt of indemnification is not deemed to taint related director actions with a presumption of self-interest. That is because indemnification has become commonplace in corporate affairs, see Stroud v. Grace, Del. Ch., C.A. No. 10719, Hartnett, V.C., Mem. Op. at 14, 20, 1990 WL 176803 (Nov. 1, 1990), rev'd in part on other grounds, Del.Supr., 606 A.2d 75 (1992), and because indemnification does not increase a director's wealth. See Hastings-Murtagh v. Texas Air Corp., S.D.Fla., 649 F.Supp. 479, 483 (1986) (applying Delaware law). The plaintiffs argue, nonetheless, that in this case the Sea-Land directors knew that they would be sued, and sought the CSX indemnity at the expense of their fiduciary duties to the shareholders. That argument assumes that the CSX indemnity afforded the directors materially greater protection from liability than they would otherwise have had. The record does not bear out that assumption.
Sea-Land's then-existing indemnity provisions covered all expenses "arising from or *805 related to any merger, tender offer or acquisition proposal ... including the completion of any such proposal...." (Second Valihura Aff. Exs. 1-8, 2.) It excluded coverage for suits in which the indemnitees are "adjudged liable because of willful misfeasance, bad faith, gross negligence or reckless disregard" of their duties. (Id.) The CSX indemnity, on the other hand, covered only the transactions contemplated in the merger agreement, but such coverage was to the fullest extent allowed by Delaware law. (Valihura Aff. Ex. 12, 38.)
Even if the CSX indemnity afforded greater protection than that offered by Sea-Land, that protection was not materially greater, and the CSX indemnity would not necessarily have protected Sea-Land's directors against a successful prosecution of many of the plaintiffs' duty of loyalty claims.[17] Therefore, there is no basis to infer that CSX's offer of indemnification could have induced Sea-Land's directors to abjure their fiduciary duty and accept the CSX Offer with its attendant risk of liability. Accordingly, the plaintiffs have not established a triable fact issue as to this claim.

B.
The plaintiffs' third claim is that the Sea-Land directors, particularly Abely, improperly favored CSX over Simmons. In evaluating that contention, the Court must determine whether (i) there was disparate treatment of bidders, (ii) the board perceived that shareholder interests would be enhanced by such disparate treatment, and if so, (iii) whether the directors' actions were reasonable in relation to the advantage they sought to achieve. Macmillan, 559 A.2d at 1288; Yanow II, supra, at 17-18.[18]
The plaintiffs do not, nor could they, fault Abely or the other Sea-Land defendants for eliciting a competing bid from CSX. What they criticize is the favored treatment CSX was allegedly given. The specifics of this claim are that CSX (a) was provided more information about Sea-Land than was Simmons, (b) received a "tip" that Simmons would offer $26 per share, (c) was permitted to negotiate with Sea-Land when Abely had canceled a meeting with Simmons and had kept him at a distance, (d) received a "lock-up" on Sea-Land treasury stock, and (e) enlisted Abely to help scare Simmons away. It is claimed that Abely also treated Simmons adversarially, and discouraged him from topping CSX's bid.
The primary evidence cited to support the most serious charge, that Abely conspired with CSX to drive Simmons away from the bidding, are undated notes made by Fahey when Schwarzman tried to call Abely after CSX authorized the $28 Offer at its April 18 board meeting. The Fahey notes refer to Schwarzman's need to talk to Abely about Abely's "script" for his meetings with Simmons the following Monday. (Ex. 124.)
It is undisputed that Abely traveled to Dallas to introduce the CSX group to Simmons. Although the plaintiffs contend that Abely went to Dallas to do CSX's bidding, the Fahey notes do not support that contention. Even if Abely did have a "script" for the Dallas meetings and had consulted Schwarzman about it, those facts alone do not evidence that Abely's purpose for seeing Simmons was to aid CSX to the detriment of Simmons and Sea-Land's other shareholders. No other evidence of record supports the claim that Abely acted to drive Simmons away, and the other (uncontroverted) evidence fatally undercuts that contention.
First, nothing in Simmons' deposition testimony, which plaintiffs concede is credible (see supra note 14) evidences that Abely was trying to deter Simmons from making a higher bid. Simmons testified that at the April 21 meeting in Dallas, Abely told him that he (Simmons) could react to CSX's offer as he wished, which Simmons took to mean that *806 Abely would recommend that Sea-Land be sold to Simmons if he topped CSX's $28 bid. Thus, Simmons understood that Abely was affording him an opportunity to submit a higher bid.
Consistent with that understanding is the fact that Abely furnished Simmons with a book of confidential information, even though Simmons had never signed a confidentiality agreement. That evidences Abely's good faith and that even at this stage, Abely was attempting to elicit Simmons' highest and best bid. Simmons also testified that he did not need all the information that CSX had received, and that he had received all the information about Sea-Land that he wanted. These facts, all undisputed, establish that Simmons was afforded a fair opportunity to make a competitive bid, yet he chose not to do so. There being no evidence to the contrary, I must conclude that Abely satisfied his fiduciary obligations in his dealings with CSX and Simmons. Citron v. Fairchild Camera & Instrument, Del.Supr., 569 A.2d 53, 68 (1989).[19]

C.
Finally, the plaintiffs argue that for the Sea-Land board to have acted reasonably in relation to its stated goal of maximizing shareholder value, it was obliged to reject the CSX Offer at the April 25, 1986 board meeting. The plaintiffs contend that Sea-Land had tremendous "leverage" over CSX, because CSX had already paid Simmons $50 million. Thus, CSX had a financial incentive not to act on its threat to withdraw its offer if that offer was not approved that day. Moreover, Sea-Land also had the leverage of its "poison pill."
The material facts and the case law are decidedly against the plaintiffs' position. All of the Sea-Land directors except Abely were independent. That fact, coupled with the advice furnished by Sea-Land's financial and legal advisors at the board meeting after an extensive market search, established that the board acted in good faith and pursuant to a reasonable investigation. See Polk v. Good, Del.Supr., 507 A.2d 531, 537 (1986); Unocal, 493 A.2d at 955. Confronting the board was a firm  and extremely short  deadline to accept or reject the CSX Offer. Those facts fatally undercut the contention that the board acted unreasonably in accepting CSX's offer that day. See Thompson v. Enstar Corp., Del.Ch., 509 A.2d 578, 582 (1984). Finally, the board's strategic decision not to negotiate in the aggressive style that plaintiffs would have preferred does not, without more, create an inference that the directors acted in bad faith. In re KDI Corp. Shareholders Litig., Del.Ch., Cons. C.A. No. 10278, Berger, V.C., Mem. Op. at 13-14, 1988 WL 116448 (Nov. 1, 1988).
The situation confronting the board on April 25, 1986, was this: CSX's $28 Offer was the highest and only offer available to Sea-Land. Dillon Read had previously contacted twenty-three potential acquirors, of which only two had expressed serious interest. By April 25, only CSX was left. Even if the Sea-Land board could have risked affronting the only remaining bidder (CSX) by rejecting its offer, it is incorrect to argue (as plaintiffs have) that CSX would have had no choice but to raise its bid because otherwise CSX would forfeit its $50 million investment. That argument ignores the fact that CSX was under no pressure to raise its bid if the Sea-Land board rejected CSX's Offer. CSX had until August 31, 1986, an additional four months, *807 to decide whether or not to exercise the Simmons Option. During those four months, if Sea-Land's fortunes declined and if no one else was interested in bidding over $28 per share, CSX could lower its bid with impunity. In that event, Sea-Land would be worse off than if the board had accepted the $28. In these circumstances, a reasonable board cannot be faulted for concluding that that risk outweighed whatever advantage might accrue from the "leverage" that Sea-Land had.[20]
The only record evidence cited to support the plaintiffs' position that CSX would have raised its bid if pressed, is plaintiff James J. Cotter's testimony. Cotter testified that a rejection of CSX's Offer "would have prompted the CSX people to come back and adjust their figure." (Cotter Dep. 177, see also Pls.' Br., 68.) This testimony besides being self-serving and conclusory, is speculative and lacks an evidentiary foundation. (See Cotter Dep. at 171-73.) Neither that testimony or any other evidence of record establishes the existence of a triable issue of fact as to this claim.[21]

* * *
For these reasons, none of the plaintiffs' duty of loyalty claims can survive the pending motions for summary judgment.

VI. THE DUTY OF CARE CLAIM

Finally, the plaintiffs claim that the Sea-Land board was not properly informed when it approved the CSX Offer, because the board acted without first discussing the other courses of action available to it. For the following reasons, the plaintiffs again have failed to raise a triable issue of fact sufficient to defeat summary judgment.
The standard for determining whether a board decision was sufficiently informed is gross negligence. Smith v. Van Gorkom, Del.Supr., 488 A.2d 858, 873 (1985). As proof of the Sea-Land's directors' gross negligence, the plaintiffs point to the testimony of certain directors that the subject of "leverage" was never discussed at their April 25, 1986 board meeting. Even if that were true, it does not, in these circumstances, create an inference or a triable fact issue as to whether the board's decision to approve the CSX Offer was grossly negligent. Only five months earlier the Sea-Land board authorized Dillon Read to canvass the acquisition market. Dillon Read did that, and the board knew full well the minimal market interest in the company. The board was also aware of the prior dealings with Simmons and Simmons' unwillingness to offer more than $26. The directors met several times, and at the critical April 25 meeting they discussed with Sea-Land's advisors the merits of the CSX Offer in light of this background and events of the previous week. The directors understood Sea-Land's available alternatives and the ramifications of rejecting the CSX Offer.[22] Any comparison of the deliberations and behavior of this board to that of the directors in Van Gorkom only underscores the due care with which the Sea-Land directors proceeded.
The evidence does not support an inference of gross negligence. Therefore, as a matter of law this claim must fail. Compare Van Gorkom, 488 A.2d at 873-88 (finding *808 liability) with Fairchild Camera, 569 A.2d at 66-67 (no liability).

VI. CONCLUSION

For the above reasons, the defendants' motions for summary judgment are granted. IT IS SO ORDERED.
NOTES
[1] That 39.5% block was owned by two Simmons' affiliates, LLC Corporation ("LLC") and Amalgamated Sugar Company ("Amalgamated"). Simmons and those two entities are referred to collectively as the "Simmons Group".
[2] Except where otherwise noted, the facts are not in dispute; in any event the Court finds that no genuine dispute of material fact exists.
[3] Under the rights plan, once a "hostile person" acquired 35% of Sea-Land's outstanding common stock, the rights would be distributed, and the board would then have ten business days to decide whether or not to redeem the rights. If a hostile person acquired 40% of Sea-Land's outstanding common stock, the rights would then become exercisable. Upon exercise, each holder of the rights would be entitled to receive Sea-Land common shares having a market value of two times the then-current purchase price.
[4] The purpose of the Sea-Land Option was to enable CSX to obtain majority control of Sea-Land in the event Simmons decided not to tender his shares into the CSX Offer.
[5] The Sea-Land board was never made aware of CSX's $32 price ceiling, and never learned that information until it was disclosed during discovery.
[6] Abely was vacationing at the time in Sea Island, Georgia.
[7] Abely ran into the CSX group at the airport and ate sandwiches with them, but was not present during their strategy discussions.
[8] The indemnification then available to Sea-Land directors covered all expenses reasonably incurred in connection with any merger, tender offer or acquisition proposal involving Sea-Land in which the directors were not adjudged grossly negligent.
[9] The Sea-Land defendants join in the CSX defendants' lack-of-injury argument.
[10] It has long been acknowledged that absent an express agreement or statute to the contrary, all shares of stock are equal. See Jedwab v. MGM Grand Hotels, Inc., Del.Ch., 509 A.2d 584, 593 (1986); Penington v. Commonwealth Hotel Constr. Corp., Del.Supr., 155 A. 514, 520 (1931); Gaskill v. Gladys Belle Oil Co., Del.Ch., 146 A. 337, 338 (1929). Flowing from that premise is the rule that all shares of the same class or series are equally entitled to share in the profits of the corporation and in the distribution of its assets on liquidation. 1 Folk, Ward & Welch, Folk on the Delaware General Corporation Law, § 151.3 at 151:13 (3d ed. 1992); see duPont v. duPont, Del.Supr., 208 A.2d 509, 512 (1965). However, in developing their "rule of equality" argument, the plaintiffs elide over another principle, namely that in some circumstances Delaware law permits shareholders (as distinguished from shares) to be treated unequally. Providence and Worcester Co. v. Baker, Del.Supr., 378 A.2d 121, 123 (1977); see Unocal Corp. v. Mesa Petroleum Co., Del.Supr., 493 A.2d 946, 956 (1985); Revlon, Inc. v. MacAndrews & Forbes Holdings, Del. Supr., 506 A.2d 173, 180-81 (1986). In this case, the driving force behind the controversial Simmons Option was Simmons' role as a significant shareholder.
[11] This unequal treatment of shareholders was found to violate N.Y.Bus.Corp.Law § 501(c) (McKinney 1986 & Supp.1993), which provides: "Subject to the designations, relative rights, preferences and limitations applicable to separate series ... each share shall be equal to every other share of the same class." Section 501(c) has been interpreted to prohibit discrimination among shareholders. See, e.g., Bank of New York v. Irving Bank Corp., N.Y.Sup., 142 Misc.2d 145, 536 N.Y.S.2d 923, 925 (1988) (finding that a "flip-in" poison pill works an impermissible discrimination among shareholders of the same class), cited in Beaumont, supra, at 3, 5. As earlier noted, Delaware law permits discrimination among shareholders (as distinguished from shares) in certain circumstances. See supra note 10.
[12] Undated notes written by Abely on the back of an envelope reflect the final terms of the Simmons Option and plans to move ahead on the CSX-Sea-Land transaction. Those notes relevantly state as follows:

1. Appr[oximately] at $28 with rights redemption and with 6.5 m[illion] sh[are] option for subm[ission] to S[hare]-Holders?
2. Recco[mend] Tender at $28
3. Meanwhile CSX takes 9.2 m[illion] shares option at $28 for $5 up-front plus $4 m[illion] in Expenses
(Ex. 80.) Abely does not recall when he made those notes.
[13] Because it makes no mention of the Simmons Option or of any payment to Simmons, Exhibit 124 has no discernable relevance to the "rule of equality" argument. That exhibit more properly relates to the plaintiffs' claim that Abely improperly favored CSX over Simmons. (See infra Section V.B.)
[14] Though the plaintiffs argue that the testimony of many of the deponents is not credible, they do concede that Simmons was "without any axe to grind at the time of his deposition." (Pls.' Br., 46.)
[15] THE COURT: So that if on day one CSX had bought out Mr. Simmons ... and then one minute after the papers were signed then went to Sea-Land and made its proposal, that would not... generate director liability?

MR. GREENBERG: That's correct.
THE COURT: But if the formal proposal were made one minute before the papers were signed, that would?
MR. GREENBERG: I think we are getting a little bit absurd, but the answer is yes.
(Oral Argument Tr., 104-05.)
[16] In Priddy, upon which the defendants rely, the two bidders for Fruehauf Corporation struck a deal between themselves. One bidder paid the other bidder $49 per share for the roughly two million shares it owned, plus $21 million as reimbursement for claimed expenses. All other shareholders were then offered $49.50 per share. The Fruehauf board approved the $49.50 offer, a decision that both the district court and court of appeals left undisturbed. That result is consistent with the conclusion reached here, assuming that the facts were as found by the district court, viz., that the Fruehauf board approved the $49.50 offer after the settlement between the bidders had occurred. Priddy, 679 F.Supp. at 1429. However, the precise facts in Priddy are not altogether clear, because the court of appeals noted that the agreements between the bidders were not executed until after the Fruehauf board had approved the offer. Priddy, 883 F.2d at 441. In any event, I need not (and do not) opine as to whether the appellate court correctly applied Delaware law to the facts as determined by it.
[17] Delaware law permits corporations to indemnify directors who have "acted in good faith and in a manner ... reasonably believed to be in or not opposed to the best interests of the corporation...." 8 Del.C. § 145(a), (b). The plaintiffs' duty of loyalty claims, and perhaps their "rule of equality" claims as well, challenge the good faith of the Sea-Land directors' actions.
[18] It is assumed for these purposes, that the Sea-Land board's goal and obligation was to sell Sea-Land at the highest price.
[19] The plaintiffs' related contentions are similarly unsupported. Abely's and the board's willingness to grant the Sea-Land Option as a condition of the CSX Offer was, in the circumstances, reasonably calculated to induce a higher, firm bid from CSX. Therefore, it was not a fiduciary duty violation. Yanow v. Scientific Leasing, Inc., Del. Ch., C.A. Nos. 9536 & 9561, Jacobs, V.C., Slip. Op. at 11-12 & n. 6, 1988 WL 8772 (Feb. 5, 1988, revised Feb. 8, 1988); see Macmillan, 559 A.2d at 1286. The same is true of the "tip" to CSX on April 9 regarding Simmons' planned bid of $26. Such a tip would merit grave concern had it occurred during an auction. See Macmillan, 559 A.2d at 1283. However, that information was given to CSX to induce it to enter the fray so that an auction might later take place. In these circumstances that conduct was not an actionable breach of fiduciary duty. Finally, whatever hostility Abely may have felt toward Simmons is not material, because it had no demonstrated adverse effect upon the bidding process, and did not impede Abely from discharging his fiduciary obligation to seek the best available price from both CSX and Simmons. Fairchild Camera, 569 A.2d at 68.
[20] Although Sea-Land also had the leverage of its poison pill, this Court cannot say today that in April of 1986 the Sea-Land board was legally obligated to use its poison pill to resist the only bidder for its stock, or that by doing so the board would likely have achieved a better result. See City Capital Assocs. Ltd. Partnership v. Interco Inc., Del.Ch., 551 A.2d 787, 798 (1988).
[21] The absence of competent evidence that a higher bid would be forthcoming also supports the defendants' position that no cognizable injury has been proven. Without evidence of injury the plaintiffs would not be able to recover damages. Yanow II, supra, at 13 n. 6; Cinerama, Inc. v. Technicolor, Inc., Del.Ch., C.A. No. 8358, Allen, C., Slip. Op. at 42-43, 1991 WL 111134 (June 21, 1991, revised June 24, 1991). Citing Beaumont, the plaintiffs argue that the level of damages is the difference between the amount per share paid to Simmons ($33.44) and the amount other shareholders received ($28). However, that measure of damages presupposes that the plaintiffs are entitled to proceed on their "rule of equality" claim  which the Court has rejected. See supra Section IV.
[22] Abely II Dep., 181-82, 184; Allison Dep., 165-67; Dixon Dep. 162-63, 165; Dragone Dep., 157-58; Kerley Dep., 155; Muller Dep., 170-71; Nimitz Dep., 122; Sticht Dep., 121-23.