Julia B. WILLIAMS, et al., Plaintiffs,

v.

THE 5300 COLUMBIA PIKE CORP.,
et al., Defendants.

Civ. A. No. 95–225–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 13, 1995.

Julian Karpoff, Karpoff, Title & Mitnick, Arlington, VA, for plaintiffs.

Thomas C. Mugavero, Montedonico, Hamilton & Altman, P.C., Washington, DC, for defendants.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

This action is a collection of federal and state claims in which a few residents of a cooperative apartment building complain they were treated unfairly by the cooperative corporation when the cooperative was converted to condominiums. Plaintiffs' basic complaint is that, while the condominium conversion increased the apartment units' value, this increase was enjoyed solely by the residents who participated in the conversion and purchased condominiums. But plaintiffs, who were unable to obtain financing to participate in the conversion, did not receive the benefit of this increase. In plaintiffs' view, this violated federal antitrust and housing discrimination laws, and amounted to a breach of contract and fiduciary duties under state law.

The antitrust claims fail to pass threshold muster and must be dismissed. The housing discrimination claim survives threshold dismissal, although it remains to be determined whether it may be resolved on summary judgment. The state claims, entertained pursuant to supplemental jurisdiction, also require further development and argument for disposition.

## I.

Carlyle House, the building at the center of this dispute, is located at 5300 Columbia Pike in Arlington, Virginia, and contains 136 residential units. It was built in 1976 and operated initially as a rental apartment building. In 1980, the building was converted to ownership by a cooperative association. In this connection, a Delaware corporation was formed, namely the defendant The 5300 Columbia Pike Corporation ("the Co-op Corporation"). The Co-op Corporation purchased Carlyle House, financing the purchase with a mortgage secured by the building. The corporation then issued stock allocated among the various apartment units in the building. Each shareholder, in addition to being a partial owner of the corporation, became entitled to occupy an apartment in the building under a proprietary lease. The corporation relied on the shareholders' monthly payments under the proprietary leases to meet its mortgage obligations. From time to time, shareholders defaulted on their proprietary lease payments. When these defaults went uncured, the Co-op Corporation obtained possession of the defaulting shareholder's shares and their apartment units. The corporation would then hold these "defaulted shares" until they could be sold to a new shareholder.

The Board of Directors of the Co-op Corporation consisted of five individuals, each a resident[1] of the building. In the early 1990's, the Board began to explore the idea of converting the building to a condominium form of ownership. In September 1993, the corporation's by-laws were amended to permit the Board to develop a plan for such a conversion. The amended by-laws provided that upon approval by a majority of both the Board and the shares, the Board would have discretion to implement the plan "in the best interests of the shareholders as a whole," and its discretion would be subject to challenge only upon a showing of bad faith.

The Board developed a condominium conversion plan under which each resident would have the opportunity to purchase his or her unit in fee simple as a condominium in return for a payment equal to a proportionate share of the Co-op Corporation's mortgage. Because most residents would need to borrow money to make this purchase payment, the corporation arranged with a lender, Crestar Bank, to offer financing to each of the residents in the form of mortgages on the condominium units. Once the Co-op Corporation sold the units to the residents and collected the purchase payments, it would then be able to retire its own mortgage on the building and dissolve. After the conversion, the building's common areas would be owned and maintained by a condominium association to which each resident would belong. A Virginia corporation would be formed for this purpose, namely the defendant The Carlyle House Unit Owners' Association, Inc. ("the Condominium Association"). The five directors of the Co-op Corporation would become the directors of the Condominium Association.

The Board's conversion plan dealt with two anticipated complicating factors. First, it was anticipated that not every resident would be willing or able to purchase her unit from the Co-op Corporation in the conversion. As a result, the plan called for the Co-op Corporation to sell each of these "non-participating" units to the newly-created Condominium Association, and to use the proceeds first to pay off the unit's share of the master mortgage, then to repay any remaining debts owed by the non-participating shareholder to the Co-op Corporation, and finally to pay the seller's portion of the closing costs of the acquisition. Any remaining proceeds, or "equity," would go to the non-participating shareholder in exchange for cancellation of

---

1. For convenience, the term "resident" is used to refer to a person who was a shareholder and proprietary lessee of the Co-op Corporation.

her stock and proprietary lease interest. The second complicating factor anticipated by the plan was that some of the building's units were unoccupied, the former residents having defaulted on their obligations and surrendered their shares to the Co-op Corporation. To cover this complication, the plan called for the Co-op Corporation to sell these defaulted units to the Condominium Association, with the proceeds, after satisfaction of debts, to be distributed ratably among the Co-op Corporation's shareholders at its dissolution.

With respect to disposition of both non-participating and defaulted units, the Board had to set the price at which the units would be sold to the Condominium Association. In this regard, the Board expected that the market value of the building's units as condominiums would be higher than the market value of the corresponding shares in the cooperative. Conversion, the Board recognized, might well result in an increase in each unit's market value.[2] To ascertain what the units might be worth as condominiums, the Board commissioned preparation of "target" appraisals. These appraisals are the subject of dispute, for plaintiffs allege that the Board improperly concealed them from the residents. Thus, the minutes of the Board's June 15, 1994 meeting reflect a decision to "keep the exact amounts [of the target appraisals] unpublicized for now, to prevent owners from taking premature marketing or selling measures."

■ According to plaintiffs, the Board initially intended that the increase in market value attributable to the conversion would be enjoyed by all of the building's residents, even those who did not purchase their units

as condominiums. In support of this assertion, plaintiffs note that the Board held several meetings during late summer 1994 to acquaint residents with the proposed plan. In these meetings, the Co-op Corporation's President, David Falk, allegedly stated that non-participating units would be sold to the Condominium Association at their lower "co-op value," but would then be re-sold on the open market as condominium units, with the increase in value being remitted to the non-participating shareholders.[3] But the Board ultimately adopted a different course. It decided that the units would be sold to the Condominium Association at a price equal to their appraised fair market value as cooperative units, with the Condominium Association to retain any increase in value realized when the units were later re-sold as condominiums. Thus, the plan contained no provision by which non-participating shareholders might benefit from the increase in market value attributable to the conversion.

On September 27, 1994, the conversion plan was approved by a properly-noticed shareholder vote. The building's residents then applied for loans to purchase their units. While most of the residents obtained such loans, the residents of six units, including plaintiffs, were either unable to qualify for loans or unwilling to accept the interest rate offered to them. On December 30, 1994, the building was declared to be a condominium. By deed of January 6, 1995, the Co-op Corporation conveyed the six non-participating units, along with sixteen defaulted units, to the Condominium Association in return for the sum of $2,502,000. The Condominium Association financed this purchase by bor-

---

2. The parties disagree about the amount of the increase. For example, plaintiffs allege that the conversion increased the market value of the Mouzon unit from $93,000 as a co-op to $118,000 as a condominium, and increased the market value of the Williams unit from $109,000 as a co-op to $145,000 as a condominium. Defendants point out that those values are only appraised estimates, and that these appraised values do not reflect or take into account the substantial marketing costs required to make sales. In any event, resolution of this dispute is not required for any of the conclusions reached in this opinion.

3. Contrary to defendants' assertions, Falk's statements at the meeting are not inadmissible hearsay, at least as to some defendants, since Falk is both a party and an agent of the defendant corporations. See Rule 801(d)(2), Fed.R.Evid. In addition, the statements are not offered to prove the truth of the matter asserted if they are introduced not to show that the Board initially intended to pay the units' condominium value, but instead merely to show that Falk misstated the plan's terms, giving rise to expectations on the part of plaintiffs that were not fulfilled. See Rule 801(c), Fed.R.Evid.

rowing from Crestar Bank.[4] After distributing the proceeds according to the plan's terms, the Co-op Corporation dissolved.

Following the conversion, the Condominium Association allowed a grace period of six months for plaintiffs and other non-participating shareholders to rent and continue living in their units, during which time they could still seek financing to purchase their units. Plaintiffs contend that the proposed rents exceeded the amount they were previously paying under their proprietary leases and exceeded the units' fair market rental value.

In February 1995, while the six-month grace period was still in effect, plaintiffs commenced this action seeking damages and injunctive relief against the Co-op Corporation, the Condominium Association, and the five individuals who served as directors of both entities. Plaintiffs present two federal claims: (i) violation of the Sherman Act, 15 U.S.C. §§ 1–2, and (ii) violation of the Fair Housing Act, 42 U.S.C. §§ 3601–3631. In addition, plaintiffs present two state-law claims alleging breach of contract and breach of fiduciary duty. Defendants have moved to dismiss all four counts, while plaintiffs seek summary judgment as to liability on the state-law claims.

Diversity jurisdiction is not present here. As a result, the Court has subject matter jurisdiction over plaintiffs' state-law claims only because they are supplemental to plaintiffs' federal claims. See 28 U.S.C. § 1367. Analysis, therefore, properly begins with defendant's contention that the federal claims are without merit and should be dismissed.

## II.

The Sherman Act forbids conspiracy to restrain or monopolize interstate trade or commerce. See 15 U.S.C. §§ 1–2. Here,

plaintiffs allege that defendants conspired both to monopolize the sale of the building's non-participating and defaulted units, and to fix prices for the sale of those units.

## A.

■ As an initial matter, defendants persuasively argue that no conspiracy occurred here because the only defendants are the Co-op Corporation, the Condominium Association, and their directors. It is well-settled that a corporation cannot conspire with its wholly-owned subsidiary or with its officers and directors. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769–70, 104 S.Ct. 2731, 2740–41, 81 L.Ed.2d 628 (1984). Based on Copperweld, the individual defendant directors in this case cannot be deemed to have conspired with either the Co-op Corporation or the Condominium Association.

■ A narrow exception to the Copperweld doctrine exists for directors or officers who are "acting on their own behalf" as well as for the corporation. Copperweld, 467 U.S. at 770 n. 15, 104 S.Ct. at 2741 n. 15. But this exception applies only when "the officer has an independent stake in achieving the corporation's illegal motive." Greenville Pub. Co. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974); see also Buschi v. Kirven, 775 F.2d 1240, 1252 (4th Cir.1985). In other words, the officer or director must have a purpose that is independent of his interest in the corporation's success.[5]

Plaintiffs in this case have not alleged that any of the five directors involved had a motive independent of their interest in the success of the defendant corporations. It is true that each of the directors now owns a condominium unit in the building, and therefore if the Condominium Association was unjustly enriched at the plaintiffs' expense, the five

4. Defendants contend that they could not have received any unfair benefit from the fact that some shareholders did not purchase their units as condominiums because the Condominium Association had to assume significant debt to purchase the non-participating units. Of course, the debt assumed would have been even greater had the Condominium Association paid a higher price for the non-participating units.

5. For example, in Greenville Publishing, the panel held that the defendant newspaper company could be deemed to have conspired with its president to eliminate the plaintiff's competing newspaper because the president also had an interest in a third newspaper, one that would also have benefitted from elimination of the plaintiff's business. See 496 F.2d at 400.

directors are indirectly enjoying a portion of that unjust enrichment. But again, this merely indicates that the directors had an interest in the Condominium Association's success, both as directors and as shareholders. Because their interest is derived solely from their affiliation with the Co-op Corporation and the Condominium Association, the directors legally cannot conspire with either corporation.[6]

■ Apart from the individual directors, the only possible conspiracy in this case is between the Co-op Corporation and the Condominium Association. Yet this, too, is no antitrust conspiracy. Although *Copperweld* specifically held only that a parent corporation cannot conspire with its wholly-owned subsidiary, the Fourth Circuit has since held that *Copperweld* requires a "functional approach" to the question of intracorporate immunity and that two legally separate entities cannot conspire if they share a "similar unity of interest." *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 703 (4th Cir.1991)[7] (hospital's board of trustees could not conspire with hospital's medical staff), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992).[8] Here, the Condominium Association is essentially the successor to the Co-op Corporation under the building's new ownership regime, and it has the same function, the same five directors, and with the exception of the six non-participating units, the same shareholders as the Co-op Corporation. In sum, plaintiffs' antitrust claims fail because

the two corporations were legally incapable of conspiring with one another.

**B.**

■ Quite apart from the doctrine of intracorporate immunity, plaintiffs' allegations do not amount to an antitrust violation for other reasons. Their first claim is conspiracy to monopolize sale of the twenty-two non-participating and defaulted units in violation of § 2 of the Sherman Act. *See* 15 U.S.C. § 2. To prove conspiracy to monopolize, plaintiffs must show (1) the existence of a conspiracy to monopolize, (2) specific intent to monopolize, (3) overt acts in furtherance of the conspiracy, and (4) an effect on an appreciable amount of interstate commerce. *See, e.g., Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 895 (10th Cir.1991). A "conspiracy to monopolize" means a conspiracy to acquire or maintain the power to exclude competitors from some portion of commerce. *See American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946). The plaintiffs need not prove that the defendants succeeded or even came close to obtaining monopoly power or excluding any competitors. *See id.* at 789, 66 S.Ct. at 1129; *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1181–82 (8th Cir.1982), *cert. denied,* 461 U.S. 937, 938, 939, 103 S.Ct. 2108, 2110, 77 L.Ed.2d 313, 314 (1983). But because the gist of monopolization is the power to exclude competition, a conspiracy to monopolize must be one that is *somehow* rationally directed toward the exclusion of competitors.[9]

**6.** The Co-op Corporation and the Condominium Association are not unrelated, independent entities. *See infra* note 8 and accompanying text. As a result, plaintiffs cannot persuasively argue that the directors could conspire with one of the defendant corporations because they had an independent personal stake in the other defendant corporation. *Cf. Freeman v. Medevac Midamerica of Kansas, Inc.,* 719 F.Supp. 1014, 1015 (D.Kan.1989) (finding individual could conspire with two *independent* corporations, both of which he served as an officer).

**7.** Four judges dissented from Judge Wilkinson's *en banc* majority opinion on grounds unrelated to this issue.

**8.** Other circuits have similarly recognized that two entities cannot conspire if they comprise "a single economic unit serving a common interest." *Guzowski v. Hartman,* 969 F.2d 211, 214

(6th Cir.1992) (two racetracks owned by two corporations owned by same two shareholders), *cert. denied,* —— U.S. ——, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993); *City of Mt. Pleasant v. Associated Elec. Cooperative, Inc.,* 838 F.2d 268, 275 (8th Cir.1988) (collection of rural electric cooperatives).

**9.** *Cf. Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.,* 821 F.Supp. 1201, 1205 (E.D.Mich. 1993) (noting that plaintiff who alleges irrational or economically implausible antitrust conspiracy must come forward with particularly persuasive evidence of conspiracy), *modified on other grounds,* 821 F.Supp. 1213 (E.D.Mich.1993).

■ Here, the key element of a conspiracy to monopolize, namely an agreement directed toward excluding or lessening competition, is missing. Plaintiffs allege that the Co-op Corporation sold the twenty-two non-participating and defaulted units to a related entity, the Condominium Association, at a price below the fair market value. The simple fact is that no matter what price was paid by the Condominium Association for the twenty-two units, the transaction would have been no more or less exclusionary.[10]

Although the allegation of below-market pricing gives this case an antitrust appearance, only a moment's reflection reveals the falsity of this appearance. At most, a sale of units from the Co-op Corporation to the Condominium Association is a species of self-dealing. While self-dealing may give rise to tort or contract liability, it is not itself an antitrust violation. For example, a trustee may be liable for breach of fiduciary duty if she sells trust assets to herself at below-market prices, or if she extends herself a loan from trust assets at a below-market interest rate. But in neither case has she violated the antitrust laws. This distinction between self-dealing and monopolization was recognized in *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753 (1st Cir.1980). There, the panel rejected the notion that a conspiracy in violation of the Sherman Act occurred where a corporation's president conspired with competitors to divest the corporation of its assets at an inadequate price. The panel noted that "[w]hile it is not inconceivable that 'mere' unfair business practices, or business torts, could in the proper situation constitute an antitrust violation," the gravamen of plaintiff's complaint was that a

fair price had not been paid for the assets. *Id.* at 754. And regardless of the price paid, the effect on competition would have been the same, for the corporation would have been divested of its assets and no longer in competition. Thus, the panel recognized that a corporation's sale of its assets at a below-market price cannot be transformed into a Sherman Act violation "merely because the sale itself is characterized as a 'conspiracy', or because boilerplate language concerning 'attempt to monopolize' is included in the complaint." *Id.*[11] The same reasoning obtains here. No matter how low or unfair the price paid for the twenty-two units may have been, allegations of conspiracy to monopolize are wholly inapposite here.[12]

**C.**

■ Equally meritless is plaintiffs' claim of conspiracy to engage in price-fixing. Price-fixing, a violation of § 1 of the Sherman Act, may be horizontal, such as a pricing agreement among competing manufacturers, or vertical, such as a resale price agreement between a manufacturer and a distributor or retailer. *See, e.g., United States v. Topco Assocs., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (vertical). Such agreements are illegal whether or not the price set is reasonable. *See United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 222–23, 60 S.Ct. 811, 843–44, 84 L.Ed. 1129 (1940). But the Sherman Act does not, of course, prohibit "price-fixing" agreements between the buyer and seller of an asset. The reason, obviously, is that *every* sale requires "fixing" or setting a price.[13] Thus, the Sherman Act

**10.** There is, for example, no allegation that the Condominium Association agreed to any limits on its future sale of the twenty-two units. In fact, defendants point out that the Condominium Association must sell the non-participating and defaulted units in order to retire the debt incurred to purchase them.

**11.** *See also Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 272 (5th Cir.1979) (recognizing that Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce").

**12.** Because plaintiffs' claim of conspiracy to monopolize is without merit for the reasons discussed, the Court need not reach defendants' additional arguments that the plaintiffs have improperly defined the relevant market as consisting only of twenty-two units in one apartment building, or that defendants' control of this market constituted a natural monopoly.

**13.** *Cf. Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1436 (7th Cir.1986) ("It is not the law that if someone hires a real estate broker to sell his house for $100,000 he and the broker have made an agreement to fix the resale price of the house

merely prohibits a buyer and seller from making an agreement that restricts either party's pricing discretion in future transactions with other parties.[14]

■ Here, plaintiffs allege that the Co-op Corporation and the Condominium Association "fixed" a price for the sale of the twenty-two units. This is true, but it was not price-fixing proscribed by the Sherman Act. Rather, these entities merely set a price to effect a sale. Significantly, there is no allegation that the future pricing actions of either party was restricted. The Condominium Association did not agree, for example, to offer the twenty-two units later for re-sale only at a particular price. Plaintiffs' true complaint is not that defendants fixed a price for the sale, but that they fixed an unreasonable one. While the price set by the defendants may have been illegal, unfair, or improper for other reasons, it was not price-fixing in violation of antitrust law.[15]

## D.

■ Though not specifically mentioned in their complaint, plaintiffs have presented one additional allegation that merits attention.[16] The minutes of the Co-op Corporation's Board of Directors reveal that, several months before the conversion plan was adopted, the Board agreed not to disclose to shareholders the exact amounts of certain "target" appraisals reflecting the potential value of the building's units as condominiums. In so doing, the Board apparently wished to prevent the residents "from taking premature marketing or selling measures." According to plaintiffs, the Board feared that some residents might well seek to sell their co-op shares if they realized that the shares had increased in value as a result of the pending conversion. Thus, plaintiffs contend that an antitrust violation occurred by virtue of defendants' conspiracy to restrain or prevent sale of co-op shares prior to the conversion by suppressing the target appraisal information.

Assuming, *arguendo*, that plaintiffs' allegations regarding the target appraisals are entirely true,[17] they do not, even so, describe an antitrust violation. To be sure, the Sherman

and are therefore guilty of a per se violation of the Sherman Act, carrying felony penalties.").

**14.** Thus, it is well-established that a contract between a purchaser and a seller cannot constitute impermissible price-fixing unless it somehow affects price formation beyond the sales contemplated by the contract itself. *See Sitkin Smelting & Refining Co. v. FMC Corp.,* 575 F.2d 440, 446 (3d Cir.), *cert. denied,* 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978); *Garshman v. Universal Resources Holding, Inc.,* 625 F.Supp. 737, 743 (D.N.J.1986); *Humboldt Bay Mun. Water Dist. v. Louisiana–Pacific Corp.,* 608 F.Supp. 562, 567 (N.D.Cal.1985), *aff'd without opinion,* 787 F.2d 597 (9th Cir.), *cert. denied,* 479 U.S. 884, 107 S.Ct. 276, 93 L.Ed.2d 252 (1986); *Sausalito Pharmacy, Inc. v. Blue Shield of Cal.,* 544 F.Supp. 230, 234–37 & n. 1 (N.D.Cal.1981), *aff'd,* 677 F.2d 47 (9th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc.,* 518 F.Supp. 1100, 1107 (D.Conn.1981), *aff'd,* 675 F.2d 502 (2d Cir.1982); *Blue Cross & Blue Shield v. Michigan Ass'n. of Psychotherapy Clinics,* 1980–2 Trade Cas. ¶ 63,351, at 75,794–95, 1980 WL 1848 (E.D.Mich.1980); *Quality Auto Body, Inc. v. Allstate Ins. Co.,* 1980–2 Trade Cas. ¶ 63,507, at 76,696, 1980 WL 1887 (N.D.Ill.1980), *aff'd,* 660 F.2d 1195 (7th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Knuth v. Erie–Crawford Dairy Co-op. Ass'n,* 326 F.Supp. 48, 53 (W.D.Pa.1971), *aff'd in part and rev'd in part on other grounds,* 463 F.2d 470 (3d Cir.1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973).

**15.** For the same reasons, plaintiffs' allegations concerning the rent charged to the non-participating shareholders after the conversion do not state a valid antitrust claim.

**16.** Plaintiffs raised this allegation in memoranda and oral argument. Giving them the benefit of the doubt, the Court will construe the complaint's general antitrust claims as encompassing this allegation, as well.

**17.** Defendants have already submitted one affidavit which seems to indicate that plaintiffs' allegations are an inaccurate account of the facts. The Board's minutes indicate only that the "exact amounts" of the appraisals would not be publicized. According to defendants, there was no effort to suppress any information. The Board merely refrained from distributing a memorandum containing the target appraisal figures because it knew that the value of individual units might differ greatly from the target appraisals, and the Board did not want residents to be disappointed by failed attempts to market their units at prices near the target values. The appraisals were discussed at the Board's meeting and included in its minutes, both of which were open to the public. Moreover, the target appraisals were disclosed to the residents in time

Act forbids conspiracies to restrain trade. *See* 15 U.S.C. § 1. Yet, the statute does not impose an affirmative obligation on anyone to encourage others to trade. It does not require a party to disclose appraisals that might alert someone else to an asset's true value. Thus, the Sherman Act did not obligate the Board to disclose appraisals or other information that might cause residents to sell their shares. Even assuming that the board concealed the appraisals from the shareholders, it did nothing to restrain or prevent any resident from selling his share at any time. This is not to say that plaintiffs were not entitled to disclosure of the appraisals. Rather, it is merely to say that if the Board had a duty to disclose them, this duty arose from some source other than the Sherman Act. In sum, while the Board may have had a fiduciary or other duty to disclose the appraisals to the shareholders, its alleged decision to withhold them is not a conspiracy in violation of federal antitrust law.

### III.

■ Plaintiffs' second federal claim is that the condominium conversion plan's treatment of the non-participating shareholders violated the Fair Housing Act. *See* 42 U.S.C. §§ 3601–3631. This statute prohibits discrimination in the sale or rental of housing based on race, color, religion, sex, familial status, national origin, or handicap. *See* 42 U.S.C. § 3604. In evaluating Fair Housing Act claims, courts employ the same method of analysis used in Title VII employment discrimination cases. *See Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Thus, to establish a *prima facie* case of discrimination, plaintiffs may prove either (a) that the challenged housing action or practice was motivated by a discriminatory purpose, or (b) that it had a discriminatory impact. *See Betsey*, 736 F.2d at 986. Here, plaintiffs are attempting to succeed via the latter route, contending that African–American, Hispanic, and handicapped persons are disproportionately represented among the group of shareholders who were unable to purchase their units as condominiums.

■ A *prima facie* case is established only if the challenged housing practice had a *significant* disproportionate impact on the minorities in the total group to which it was applied. *See Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir.1986); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir.1982). Statistics have critical, if not decisive, importance in determining the significance of the alleged disparity. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 & n. 3, 108 S.Ct. 2777, 2789 & n. 3, 101 L.Ed.2d 827 (1988) (plurality) (discussing disparate impact analysis under Title VII); *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir.1978). A bare showing of a minor statistical inequality does not establish a *prima facie* case. Rather, the disparity must be "sufficiently substantial" that it raises an inference of causation. *See Watson*, 487 U.S. at 995, 108 S.Ct. at 2789. In other words, plaintiffs must offer statistical evidence of a kind and degree sufficient to show that the challenged practice caused residents to be treated unfairly *because of* their membership in a protected group. *See id.* at 994, 108 S.Ct. at 2788–89.

■ It is therefore necessary to examine closely the statistics concerning the Carlyle House's residents.[18] At the time of the conversion, shares representing 120 of the building's 136 total units were owned by individuals. Of the 120 units, 114 (or 95%) were purchased as condominiums by residents, while 6 (or 5%) were non-participating units

---

for them to sell their units prior to the conversion, which occurred in January 1995. Thus, the appraisals were made available to the shareholders at informational meetings in August 1994 and at the corporation's annual meeting in September 1994, and were published in an offering statement distributed to shareholders in connection with the conversion. In addition, defendants point out that the Board heavily emphasized to the shareholders at all times that the proposed conversion would benefit everyone by increasing the market value of the building's units.

**18.** These statistics were not included in plaintiffs' complaint, but were submitted by defendants at the Court's direction. Plaintiffs have not challenged these figures.

conveyed to the Condominium Association. The racial and disability status of the residents was as follows:

| | Non-participating Units | Participating Units |
|---|---|---|
| African–American | 2 | 8 |
| Hispanic | 1 | 4 |
| Asian–American | 0 | 10 |
| White | 3 | 92 [19] |
| Total | 6 | 114 |
| Disabled | 2 | 8 |
| Not disabled | 4 | 106 |
| Total | 6 | 114 |

As plaintiffs note, African–American, Hispanic, and disabled persons are overrepresented to some extent in the non-participating group.[20] The question is whether this numerical disparity is significant enough to warrant a *prima facie* inference that residents were treated unfairly because of their race, ethnicity, or handicap status.

While emphasizing that "rigid mathematical formula" cannot alone control the decision, courts in Fair Housing Act and Title VII cases have sometimes used "standard deviation" analysis to evaluate the significance of statistical disparities. *See Watson,* 487 U.S. at 995 & n. 3, 108 S.Ct. at 2789 & n. 3; *Betsey,* 736 F.2d at 988 n. 4 (citing *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)). Although there is no rigid rule on this point, the Supreme Court has suggested that, for large samples, a disparity of more than two or three standard deviations significantly undercuts the hypothesis that the disparities are random. *See Hazelwood,* 433 U.S. at 311 n. 17, 97 S.Ct. at 2743 n. 17; *Castaneda,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17. Yet, the converse, namely that a smaller disparity precludes a finding of discrimination, is not necessarily true. Thus, Fourth Circuit decisions have recognized that "courts of law should be extremely cautious in drawing any conclusions from standard deviations in the range of one to three." *EEOC v. American Nat'l Bank,* 652 F.2d 1176, 1193 (4th Cir. 1981), *reh'g en banc denied,* 680 F.2d 965 (4th Cir.), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). In addition, standard deviation analysis becomes less reliable where, as here, the sample is very small in size. *See American Nat'l Bank,* 652 F.2d at 1193 n. 12.[21] In this case, the statistics reveal a disparity of approxi-

**19.** These 92 units were owned by approximately 80 individuals, since some owned more than one unit for investment purposes. This fact, not taken into account in the standard deviation analysis discussed here, would marginally diminish the significance of the observed disparities.

**20.** Each party, not surprisingly, presents the statistics in the light most favorable to it. For example, defendants emphasize that 80% of African–American residents purchased their units, as opposed to approximately 97% of white residents. By contrast, plaintiffs prefer to state that 20% of African–American residents were left out of the conversion, as compared to only 3% of white residents. Alternatively, one might say that 8.3% of the building's residents were African–American, but 33.3% of those who did not participate in the conversion were African–American. The use of standard deviations to measure fluctuations from a predicted value is intended to eliminate the need to choose among these alternative, arguably deceptive, ways of characterizing the same underlying numbers.

**21.** In several opinions, Judge Widener vigorously attacked the Fourth Circuit's failure to apply correct statistical principles, especially standard deviation analysis, in evaluating evidence of discrimination. In particular, he emphasized that statistical significance tests properly account for sample size. *See Moultrie v. Martin,* 690 F.2d 1078, 1083–84 & nn. 7–10 (4th Cir.1982); *American Nat'l Bank,* 680 F.2d at 967–69 nn. 3–6 (dissenting from denial of rehearing *en banc*). Yet, even following Judge Widener's analysis, it is impossible to conclude that a *prima facie* case has not been presented here, for the largest disparity in this case, 3.02 standard deviations, is significant at a 95% confidence level.

mately 2.26 standard deviations for African–Americans, 1.57 standard deviations for Hispanic residents, 2.26 standard deviations for disabled persons, and 3.02 standard deviations for persons falling in any one or more of the three minority groups.[22] Disparities of this magnitude are inconclusive. They neither prove nor disprove discrimination. It seems likely that the statistical evidence presented here, without more, would not alone create a triable issue of fact on the ultimate question of whether there was discrimination. Yet, the numbers involved do cross, if only barely, the level required to establish a *prima facie* case and therefore avoid threshold dismissal of plaintiffs' claim. There is a distinction noticeable among the various groups' participation rates that a reasonable observer might conclude was not due to mere chance.[23]

**22.** A standard deviation is a statistic used to measure the dispersion of a distribution from an expected value. For example, 8.33% (10 out of 120) of the building's units were occupied by African–Americans. Thus, if 6 units in the building were not purchased as condominiums, one would expect that, on average and all other things being equal, 0.5 of these non-participating units would have been occupied by African–Americans. In fact, the actual number of such units occupied by African–Americans was 2. Standard deviation calculations are used to measure the significance of the difference between the expected value of 0.5 and the observed value of 2. Courts applying standard deviation analysis in discrimination cases have typically used the formula for a binomial distribution. Yet, a true binomial distribution involves what is known as "sampling with replacement." *See* Freund & Simon, *Modern Elementary Statistics* 147, 183 (8th ed. 1992). This case, like most others, involves sampling from a finite pool *without* replacement. For example, if one had randomly selected one of the building's units, there was an 8.33% (10 out of 120) chance of picking the unit of an African–American resident. But if one had then randomly selected a second, different unit, the odds would have changed. If the first unit selected was occupied by African–Americans, the odds of selecting a second African–American unit from the remaining pool would fall to 7.56% (9 out of 119). If an African–American unit was not selected first, the odds of selecting such a unit on the second try would rise to 8.40% (10 out of 119). On selecting a third unit, still different odds would apply. In other words, each "trial" or selection is not independent of the others, because units selected are not "replaced" into the pool and no unit can be selected twice. As a result, this case involves what is known as a hypergeometric distribution. *See Lilly v. Harris–Teeter Supermarket,* 720 F.2d 326, 336 n. 18 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984). The binomial distribution serves as a satisfactory approximation for the hypergeometric distribution where the number of "trials" is very small relative to the entire pool from which selections are made. *See* Freund & Simon, *supra,* at 191–93. In many discrimination cases, the pool is very large, such as all the potential jurors or employees in an entire city or county. Here, the pool consists of only 120 units. Thus, it is preferable here to use the formula for a hypergeometric distribution, which is:

$$\text{Variance} = n * \frac{a * b}{(a + b)^2} * \frac{a + b - n}{a + b - 1}$$

where *n* equals the number of trials (the 6 non-participating units), *a* equals the number of items of one kind (the 10 units with African–American residents), and *b* equals the number of the remaining items in the pool (the 110 units with non-African-American residents). *See* Freund & Simon, *supra,* at 209. The standard deviation is simply the square root of the variance. In this example, the standard deviation is approximately 0.663. Thus, the difference between the expected value of 0.5 and the observed value of 2 is a span of approximately 2.26 standard deviations. Similar calculations result in disparities of 1.57 standard deviations for Hispanic persons, and 2.26 standard deviations for disabled persons. The same analysis can be done for the combination of the three protected groups, namely African–American persons, Hispanic persons, and disabled persons. A total of 23 of the building's 120 units were occupied by persons within at least one of the three groups, while 4 of the 6 non-participating units were occupied by a person in at least one of the groups. The calculation for the three groups in combination reveals a disparity of approximately 3.02 standard deviations.

**23.** Indeed, defendants' own arguments suggest that the disparity observed here is not random. They submit that the plan had a significant disparate impact, if at all, only because African–American, Hispanic, and disabled persons continue to suffer a general economic disadvantage in American society. Because they have less money and less access to credit, they were less likely to purchase condominiums during the conversion. Discrimination by lenders might also exist, further exacerbating the disparity, but these defendants would not be liable for that discrimination. Finally, defendants' argue, a Fair Housing Act violation cannot arise from a disparity attributable to this general statistical link between wealth and race, ethnicity, and handicap status. *See Boyd v. Lefrak Org.,* 509 F.2d 1110, 1113 (2d Cir.) ("A businessman's differential treatment of different economic groups is not necessarily racial discrimination and is not made so because minorities are statistically overrepresented in the poorer economic groups."), *cert. denied,* 423 U.S.

Because plaintiffs have presented a valid *prima facie* claim under the Fair Housing Act, the burden is now on defendants to assert a legitimate business purpose or purposes for the challenged practice, namely the condominium conversion plan. Defendants have suggested several possible business justifications for the challenged aspect of the conversion plan, and after further discovery, they will have the opportunity to present these and any additional explanations.[24] Assuming defendants succeed in establishing a legitimate business purpose, and showing that no less discriminatory alternative was available to accomplish that purpose, the burden will shift to plaintiffs to present evidence showing that defendants' explanations are merely pretextual and that impermissible discrimination was in fact involved. *See Betsey,* 736 F.2d at 988. In sum, defendants' motion to dismiss the federal housing discrimination claim must be denied, but the stay of discovery will be lifted so the parties may pursue discovery, after which defendants may seek summary judgment, if the record warrants.

## IV.

In addition to their federal claims, plaintiffs contend that defendants are liable for breach of contract and fiduciary duty. Defendants have moved to dismiss these claims, while plaintiffs seek summary judgment. The initial question is whether these claims should be adjudicated here or dismissed without prejudice to permit the parties to adjudicate them in state court.

### A.

■ Defendants argued for dismissal of the state-law claims in the event all federal claims were dismissed. *See* 28 U.S.C. § 1367(c)(3) (district court may dismiss supplemental claims after dismissing all claims within original jurisdiction). As discussed above, the federal housing discrimination claim survives defendants' threshold attack. Yet, district courts may also decline to exercise supplemental jurisdiction over a state-law claim that "raises a novel or complex issue of State law," or "substantially predominates" over the federal claims involved. *See* 28 U.S.C. § 1367(c)(1)–(2). In addition to the novelty and complexity of the issues, factors relevant to the exercise of this discretion are judicial economy, convenience of and fairness to litigants, and comity between the state and federal courts. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966). These factors, applied here, point persuasively to the conclusion that jurisdiction over the state-law claims should be retained.

In general, novel and difficult questions of state law should be decided by that state's courts. And the force of this principle increases with the degree of novelty and difficulty. Yet, dismissal in these circumstances gains nothing if the dismissed state-law claims are then filed and decided in another state's courts. Because plaintiffs and their counsel, as well as defendants and the Carlyle House building, are located in Virginia, it appears likely that plaintiffs would pursue their state-law claims in Virginia courts if

896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975). Even assuming, *arguendo,* that defendants' premise is correct, that economic inequality was the sole cause of the asserted disparities, defendants are still not entitled to threshold dismissal of plaintiffs' claim. *See Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1037–38 n. 10 (2d Cir.1979) (rejecting *Boyd*'s suggestion that Title VII's burden-shifting scheme does not apply under Fair Housing Act); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988); *Tinsley v. Kemp,* 750 F.Supp. 1001, 1010–11 (W.D.Mo.1990). While these defendants ultimately may not be held liable under the Fair Housing Act for economic discrimination, the existence of a significant statistical disparity, even one resulting from economic inequality, is

sufficient to create a *prima facie* case and shift the burden to the defendant to come forward with a legitimate business justification for the challenged practice. If the defendant succeeds, the burden shifts finally back to the plaintiff to prove that there was discrimination by showing that the proffered justification is pretextual. At that point, defendant must prevail if it appears that the disparity was attributable to economic inequality rather than impermissible discrimination. In sum, defendants' argument may ultimately prove to be dispositive, but it does not dispose of plaintiffs' claim at this stage.

**24.** In addition, defendants may respond to plaintiffs' allegation that they were charged exorbitant rents to continue living in the building during the six-month grace period following the conversion.

they were dismissed here. From this, it follows that dismissal under § 1367(c) would gain nothing if Delaware law, rather than Virginia law governs the state-law issues. Analysis of the § 1367 dismissal issue appropriately begins with the choice of law question.

Plaintiffs were shareholders of a Delaware corporation that operated a cooperative apartment building in Virginia. In general, the internal affairs of a corporation are governed by the law of the state of incorporation. *See Bockover v. Life Ass'n of America,* 77 Va. 85 (1883); *Draper v. Paul N. Gardner Defined Plan Trust,* 625 A.2d 859, 864–66 (Del.1993); 18 Am.Jur.2d *Corporations* §§ 17–27 (1985); Restatement, Conflict of Laws 2d §§ 302–306. Of course, a corporation is subject to regulation by other states in which it carries on its activities, and under certain circumstances, the law of these states may displace the corporate law of the state of incorporation. For example, many states regulate the affairs of cooperatives and condominiums. Thus, Virginia has an extensive statutory scheme applicable to cooperative apartment buildings located within its borders. *See* Va.Code §§ 55–424 to 55–506. The statute contains detailed provisions governing the termination of cooperative ownership. *See* Va.Code § 55–454.[25] Yet, Virginia's statute applies only to cooperatives created after July 1, 1982. *See* Va.Code § 55–425(A). As a result, it does not apply to the cooperative involved here, which was created in 1980. Virginia also has a statutory scheme governing condominiums. *See* Va. Code §§ 55–79.30 to 55–79.103. Yet, it also contains no provision applicable to the central issue presented here, namely the Co-op Corporation's treatment of its shareholders in the conversion. Because Virginia law contains no provision governing the relationship between the Co-op Corporation and its shareholders, that relationship remains governed solely by the law of the state of incorporation, namely Delaware.

Absent assurance from the parties that the state claims, if dismissed without prejudice, would be brought in Delaware, there is little reason to dismiss the case based on the novelty or complexity of the issues presented. Moreover, dismissal here would disserve the goals of judicial economy, convenience, and fairness, since the parties have already conducted a substantial amount of discovery, and the Court is already familiar with the facts of the case. As a result, the Court will retain supplemental jurisdiction and address the merits of plaintiffs' state-law claims.

**B.**

■ This is, distilled to its essence, a case about a corporation's obligations to its shareholders.[26] Plaintiffs argue that the conversion plan violated the fundamental principle that all shares of the same type must be treated equally.[27] Yet, the conversion plan

---

**25.** The statute provides that, upon termination of a cooperative, "the respective interests of proprietary lessees are the fair market values of their cooperative interests immediately before the termination." Va.Code § 55–454(E)(1). Each side in this case interprets the word "termination" differently, and therefore each believes that the statute would support its position if applied. Defendants argue that the statute provides for valuation immediately prior to termination *of cooperative ownership* of the building, and so requires valuation of the units as cooperative apartments. Plaintiffs argue that the statute requires valuation immediately prior to termination, or dissolution, *of the Co-op Corporation.* By the time the Co-op Corporation was dissolved, the conversion to condominium ownership had occurred, and therefore plaintiffs contend that valuation of the units as condominiums was appropriate. It is unnecessary to resolve this dispute because the statute does not apply to this case.

**26.** Plaintiffs' claim for breach of contract is essentially identical to their claim for breach of fiduciary duty, since it is based on the principle that shareholders' rights are contractual in nature. *See Gaskill v. Gladys Belle Oil Co.,* 16 Del.Ch. 289, 146 A. 337, 339 (1929) ("It is elementary that the rights of stockholders are contract rights.").

**27.** This principle applies to all Delaware corporations by statute and case law. *See* Del.Code tit. 8, § 8–151(a), (d) (stock shall have only those preferences stated in, or adopted by resolution authorized by, certificate of incorporation); *Grover v. Simmons (In re Sea–Land Corp. Shareholders Litig.),* 642 A.2d 792, 799–803 (Del.Ch.) (discussing Delaware's "rule of equality"), *aff'd without published opinion,* 633 A.2d 371 (Del.1993). In addition, plaintiffs point to a provision in the Co-op Corporation's by-laws requiring that all shares receive a ratable portion of the corporation's assets in the event of dissolution.

did treat all shares equally in the sense that every resident was offered the same opportunity to purchase a condominium unit. Plaintiffs suggest, without citing authority, that a corporation cannot grant shareholders an opportunity, even on equal terms, if shareholders' varying ability to obtain access to capital will mean that some enjoy the opportunity and others do not.[28] The absence of cited authority is no accident; the law is sensibly to the contrary. Were this not so, a corporation, for example, would be precluded from issuing a dividend in the form of an option to purchase some asset, such as stock or a bond, at a particular price. To exercise the option would require payment of the designated price, a requirement that shareholders of unequal wealth would have an unequal ability to meet. Yet, corporations are not barred from issuing such dividends. *See generally* 18B Am.Jur.2d *Corporations* § 1175 (1985). In short, there is no rule of Delaware law that requires the type of equality demanded by plaintiffs.[29]

The situation plaintiffs present is appropriately analyzed in terms of fairness rather than equality. A corporation may sell all or substantially all of its assets, but the directors have a fiduciary duty to obtain a fair price. *See Allaun v. Consolidated Oil Co.*, 16 Del.Ch. 318, 147 A. 257, 260 (1929); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of America*, 14 Del.Ch. 1, 120 A. 486, 493–94 (1923).[30] A fair price is one to which a reasonable and willing seller and a reasonable and willing buyer, under all circumstances, would agree. *See Marks v. Wolfson*, 41 Del.Ch. 115, 188 A.2d 680, 686 (1963).[31] Ordinarily, determination of the assets' fair value is within the directors' business judgment and discretion, and the burden of proof is on the dissenting shareholder to demonstrate unfairness. *See Baron v. Pressed Metals of America, Inc.*, 35 Del.Ch. 325, 117 A.2d 357, 361 (1955), *aff'd*, 35 Del.Ch. 581, 123 A.2d 848 (1956). But where, as here, the directors and the shareholders who approved the sale have an interest in the transaction,[32]

**28.** It is important to note that the defendant corporations had no control over the shareholders' dealings with potential lenders. *See Sea–Land*, 642 A.2d at 803 ("To be chargeable with having violated a fiduciary duty involving equal treatment precepts, the board must at the very least have approved the transaction creating the disparity.").

**29.** Thus, Delaware courts recognize that "in some circumstances Delaware law permits shareholders (as distinguished from shares) to be treated unequally." *Sea–Land*, 642 A.2d at 799 n. 10. While the Co-op Corporation treated all shares equally, an inequality arose because of the shareholders' varying economic and credit status.

**30.** In September 1993, an amendment to the Co-op Corporation's by-laws provided the Board with discretion to implement a conversion plan in the shareholders' "best interests" subject to challenge only for bad faith. Yet, a by-law amendment surely cannot eliminate directors' fiduciary duty of loyalty and fairness to shareholders. *See* Del.Code tit. 8, § 102(b) (providing that certificate of incorporation may limit directors' personal liability, but may not waive liability for breach of duty of loyalty).

**31.** The relevant considerations and methods for determining fair value have been set forth in numerous opinions. *See, e.g., Baron v. Pressed Metals of America, Inc.*, 35 Del.Ch. 581, 123 A.2d 848 (1956); *Alcott v. Hyman*, 42 Del.Ch. 233, 208

A.2d 501 (1965). It is important to note that the fair value of the units here was not necessarily the "co-op value" or the "condominium value." While no rational purchaser would have paid more than the condominium value, reasonable parties to such a sale might well have negotiated a price somewhere in between so as to divide the benefits accruing from the sale.

**32.** An individual is "interested" in a sale transaction if she serves as a director, or shareholder, of both the selling and purchasing corporations. *See Alcott*, 208 A.2d at 505–06; *Abelow v. Symonds*, 40 Del.Ch. 462, 184 A.2d 173, 175 (1962), *aff'd sub nom., Abelow v. Midstates Oil Corp.*, 41 Del.Ch. 145, 189 A.2d 675 (1963). Here, disinterested director approval was impossible, because the two corporations involved had the same five directors. Similarly, at the time they voted on the conversion plan, the Co-op Corporation's shareholders intended later to become shareholders of the Condominium Association and, with the exception of plaintiffs and the other non-participating shareholders, they eventually did so. Thus, the majority of the selling corporation's shareholders had an expectant interest in the purchasing corporation, and their approval of the sale was not disinterested. Defendants have submitted evidence indicating that one of the plaintiffs, Julia Williams, voted in favor of the conversion plan. Had a majority of the non-participating shareholders voted in favor of the plan, it would be necessary to decide whether this constituted disinterested shareholder approval.

the burden shifts to the proponents of the sale to show the directors' "utmost good faith" and the transaction's "scrupulous fairness." *See Alcott v. Hyman*, 42 Del.Ch. 233, 208 A.2d 501, 506–07 (1965). Thus, the question presented here is what was a fair price for sale of the non-participating and defaulted units.

■ Plaintiffs' central argument is that the units became more valuable as a result of the condominium conversion, and that a fair price for the units, and consequently for plaintiffs' stock, had to include all, or at least some, of this increase in value. Yet, contrary to plaintiffs' assertions, there is no rule of law providing that, where assets become more valuable as a result of being sold, a fair sale price *must* include this increase in value. In fact, some authority indicates there is a rule to the contrary, providing in effect that a fair price does not include any part of an increase in value attributable to the sale itself. When corporations undergo significant changes, such as mergers, consolidations, or as here, sales of all or substantially all assets, disgruntled shareholders sometimes have a statutory right to demand appraisal and payment of their stocks' fair value. There is a long and well-established rule that the court's valuation of the stock should not be affected by the merger, sale, or other trans-

action that gives rise to the appraisal proceeding. In other words, if a corporation becomes more valuable as a result of a transaction, this increased value is to be enjoyed only by the shareholders who participate in the transaction. This principle has been recognized by numerous courts,[33] commentators,[34] state legislatures,[35] and the drafters of model corporation laws.[36] For example, Delaware law provides that courts in appraisal cases shall determine the stock's "fair value exclusive of any element of value arising from the accomplishment or expectation" of the disputed transaction. Del.Code tit. 8, § 262(h). If applicable here, this principle firmly supports defendants' view that the Co-op Corporation's assets and stock were properly valued on the basis of the their "co-op value," rather than on the basis of their condominium value.

Yet, several questions remain to be answered regarding the application of this principle under Delaware law and the facts of this case. Does the principle apply only in cases arising under the appraisal statute, or in other contexts where the fair value of a corporation's assets or stock are disputed, such as where minority shareholders attack a transaction's fairness by suing the corporation or its directors for breach of fiduciary duty?[37] Does it apply in a case involving a sale of assets rather than a merger or consol-

**33.** *See Tri–Continental Corp. v. Battye*, 31 Del.Ch. 523, 74 A.2d 71, 72 (1950) (recognizing that "[t]he basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which was taken from him"); *Chicago Corp. v. Munds*, 20 Del.Ch. 142, 172 A. 452, 455 (1934) (recognizing that valuation must be made "as if the merger had never been conceived"); *see also* Annotation, *Valuation of Stock of Dissenting Stockholders in Case of Consolidation or Merger of Corporation, Sale of Its Assets, or the Like*, 48 A.L.R.3d 430, § 4 (1973); Annotation, *Valuation of Stock of Dissenting Stockholders in Case of Consolidation or Merger of Corporation, Sale of Its Assets, or the Like*, 38 A.L.R.2d 442, §§ 4[b], 11 (1954).

**34.** *See* 18A Am.Jur.2d *Corporations* § 805, at 678; § 837, 708–09 (1985); 18 C.J.S. *Corporations* § 349, at 685 (1990); Lattin, *Remedies of Dissenting Stockholders Under Appraisal Statutes*, 35 Harv.L.R. 233, 243 (1931); Manning, *The Shareholder's Appraisal Remedy: An Essay for Frank Coker*, 72 Yale L.J. 223, 231 (1962); Note, *Appraisal Statutes—An Analysis of Modern Trends*, 38 Va.L.Rev. 915, 932 (1952).

**35.** *See, e.g.*, Cal.Corp.Code § 1300(a); Conn.Gen. Stat. § 33–855(3) (effective January 1, 1997); Fla.Stat. § 607.1301(2); Ind.Code § 23–1–44–3; Mich.Comp.Laws § 450.1761(d); Tex.Bus.Corp. Act art. 5.12A(1)(a); Va.Code § 13.1–729.

**36.** *See* ALI–ABA Model Business Corp.Act. § 13.01(3) (3d ed. 1984) (defining shares' "fair value" as value "immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable"); ALI–ABA Model Business Corp.Act § 81(a)(3) (2d ed. 1969) (same).

**37.** Authority other than Delaware case law, although meager, indicates that the principle applies in non-appraisal cases. *See Perkins v. Public Serv. Co.*, 93 N.H. 459, 45 A.2d 210, 212–14 (1945); Annotation, 48 A.L.R.3d at 451, § 4[a]; Annotation, 38 A.L.R.2d at 450, § 4[b]. Delaware cases offer mixed signals on this point. *Compare Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107, 111 (1952) (disregarding increased value of target corporation's stock

idation?[38] Finally, is this general principle subject to any exceptions relevant here?[39]

In sum, defendants have not established that this or any other rule of Delaware law warrants threshold dismissal of plaintiffs' claims. Similarly, plaintiffs have not estab-

lished grounds entitling them to summary judgment, for they have not shown how the Court may determine, without relying on disputed factual issues, that defendants failed to set a fair price for the corporation's assets and to assign a fair value to plaintiffs' stock.[40] As a result, both defendants' motion to dis-

attributable to attempted merger, where minority shareholders sued to enjoin allegedly unfair merger), *with Cinerama, Inc. v. Technicolor, Inc.,* 63 U.S.L.W. 2291, 1994 WL 568654, at *9 (Del. Ch.1994) (noting, in suit for breach of fiduciary duty, that merger's terms reflected fair allocation of "synergistic value" arising from merger, without mentioning appraisal statute or suggesting Delaware law requires court to disregard such value in evaluating merger's fairness), *and Tanzer v. International Gen. Indus., Inc.,* 402 A.2d 382, 393–95 (Del.Ch.1979) (suggesting that, while appraisal statute precludes dissenting shareholders from sharing in appreciation caused by merger, same rule does not apply in non-appraisal cases, but concluding evidence that merger increased company's value was too speculative to demonstrate merger's unfairness).

38. On this question, authority from other states suggests that mergers and sales of assets are treated identically. Appraisal statutes in most states apply to both mergers and sales of assets, and therefore courts apply the same valuation principles to each. *See, e.g., In re Clark's Will,* 257 N.Y. 487, 178 N.E. 766, 768 (1931). Yet, Delaware's legislature and its courts have previously shown a unique propensity to distinguish mergers and sales of assets with regard to valuation and the rights of dissenting shareholders. For example, Delaware is one of the small minority of states where appraisal is generally not available after a sale of all or substantially all of a corporation's assets. *See* Del.Code tit. 8, § 262(c) (appraisal rights apply after sale of assets only if certificate of incorporation provides); *Tanzer,* 402 A.2d at 390–91 (appraisal rights generally not available for sale of assets). Moreover, Delaware courts have declined to find that a properly executed sale of assets may be treated as a *"de facto* merger" to which appraisal rights extend. *See Hariton v. Arco Elecs., Inc.,* 40 Del. Ch. 326, 182 A.2d 22, 26–27 (1962), *aff'd,* 41 Del.Ch. 74, 188 A.2d 123 (1963); *Heilbrunn v. Sun Chem. Corp.,* 38 Del.Ch. 321, 150 A.2d 755, 757–59 (1959). More specifically, in two cases, Delaware courts have implied that where minority shareholders challenge a sale of assets, as opposed to a merger, valuation may take into account an increase in the assets' value that is attributable to the sale itself. *See Sterling,* 93 A.2d at 111–14 (holding that, upon a merger, minority shareholders are entitled to receive property substantially equivalent in value to what they had before the merger was proposed, but repeatedly emphasizing that case did not involve a sale of assets); *Tanzer,* 402 A.2d at 390–91 (discussing minority shareholders' argument that

"cash-out" merger was unfair because it enabled majority shareholders to appropriate entire accession to company's value caused by merger, when alternative forms of same transaction, such as sale of assets, would have enabled minority shareholders to share accession).

39. It is unclear whether Delaware law provides for any exception. One court has recognized that an exception exists where fraud is present. *See Jones v. Missouri–Edison Elec. Co.,* 233 F. 49, 50 (8th Cir.1916). A second possible exception exists for shareholders involuntarily excluded from the disputed merger or sale. A shareholder who opposes and elects not to participate in a transaction should neither share in the gain if the transaction increases the company's value, nor share in the loss if it has the opposite effect. *See, e.g., In re West Waterway Lumber Co.,* 59 Wash.2d 310, 367 P.2d 807, 810 (1962). Yet, this reasoning does not apply to shareholders who have no choice whether to participate. Thus, appraisal statutes in many states expressly provide that the increased value of a corporation arising from a sale or merger is not excluded from valuation if "such exclusion would be inequitable." *See, e.g.,* Colo.Rev.Stat. § 7–113–101(4); Idaho Code § 30–1–81(a)(3); N.H.Rev.Stat. § 293–A:13.01(3); S.D.Codified Laws § 47–6–40(3); Va.Code § 13.1–729. Although this proviso has received little judicial interpretation, the commentary to the Model Business Corporation Act indicates that it aims to distinguish a minority shareholder "excluded against his will," such as by a "squeeze-out" merger, from one who willingly "refuses to maintain a continuing interest" in the corporation after the merger or sale. *See* Conrad, *Amendments of Model Business Corporation Act Affecting Dissenters' Rights (Sections 73, 74, 80, and 81),* 33 Bus.Law. 2587, 2601 (1978). Here, plaintiffs do not fit neatly into either category, for the corporation invited them to participate in the conversion by buying their units as condominiums, but they were excluded by their inability to obtain financing on acceptable terms.

40. Although not alleged in their complaint, plaintiffs have cited one additional manner in which the defendants allegedly breached their fiduciary duties, namely by their suppression of certain target appraisals of the units' value as condominiums. *See supra* Part II.D. If privy to the target appraisals, plaintiffs argue, they could have sold their Co-op Corporation stock prior to the conversion at a price higher than the stock's "co-op value." Plaintiff may seek to add this allegation to their complaint by amendment, and, if so,

miss and plaintiff's motion for summary judgment must be denied. The stay of discovery now in effect will be lifted, and both parties, after discovery, have leave to seek summary judgment on the issues presented here, should the record warrant it. In addition, the parties may indicate whether they believe certification of questions to the Delaware Supreme Court would be advisable in this case.[41]

### V.

In sum, plaintiffs' federal antitrust claims are without merit and must be dismissed, and their federal housing discrimination claim survives threshold dismissal, but, after discovery, may yet fail on summary judgment motion in the event defendants establish a legitimate non-discriminatory purpose for the challenged aspects of the plan and plaintiffs fail to show that the purpose is pretextual. The Court will continue to exercise supplemental jurisdiction over plaintiffs' state-law claims, and the parties will now have an opportunity to pursue discovery and address the questions of Delaware corporate law presented here at the summary judgment stage.

An appropriate order will issue.

defendants may test the presence of factual support for it by way of motion for summary judgment. *See supra* note 17.

41. *See* Del. Const. art. IV, § 11(9); Del.Supreme Court Rule 41(a)(ii); *Rales v. Blasband,* 626 A.2d 1364 (Del.1993).